UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.

**SAEED AKHTAR KHAN, M.D.,**

**Plaintiff,**

**vs.**

**NOEL E. STEPHEN, individually and**
**in his official capacity as**
**Sheriff of Okeechobee County,**
**TERESA CHANDLER,**
**JAVIER GONZALEZ,**
**JONATHAN S. HENDRICKS,**
**ASHLEY K. ALBRIGHT,**
**each in their individual capacities, and**
**THOMAS BAKKEDAHL,**
**in his official capacity as State Attorney**
**of the Nineteenth Judicial Circuit.**

**Defendants.**
_____/

# **COMPLAINT**

Plaintiff, SAEED AKHTAR KHAN M.D. ("Dr. Khan"), sues collectively Defendants NOEL E. STEPHEN, ("Sheriff Stephen") individually and in his official capacity as Sheriff of Okeechobee County, TERESA CHANDLER, JAVIER GONZALEZ, JONATHAN HENDRICKS, and ASHLEY ALBRIGHT, all in their individual capacities, and THOMAS BAKKEDAHL, in his official capacity as STATE ATTORNEY for the Nineteenth Judicial Circuit of Florida.

## **INTRODUCTION**

1.    Dr.Khan alleges that each of the Defendants as well as others named herein developed and participated in an extortion scheme to deprive him of his civil rights in the scope

of two separate but related *criminal prosecutions* for misdemeanor crimes (relating to two alleged victims), and in the scope of *civil administrative proceedings* with the Florida Department of Health ("DOH"), relating to the same subject matter, which resulted in the issuance of an unwarranted emergency restriction order restricting Dr. Khan's right to practice medicine in Florida.  In addition, the Defendants participated in an extortion scheme by litigating a *civil lawsuit* brought against Dr. Khan relating to the same subject matter.

2.      The object of this extortion scheme, which lasted from at least February 2020 through at least April 7, 2023, was to force Dr. Khan, through attrition and desperation, to pay monetary settlements to Chandler, a former patient, and then to her friends, such as Campbell, another former patient, despite their frivolous and false allegations of sexual misconduct relating to his long-standing medical practice in Okeechobee, Florida, and also to win the criminal trials involving them as alleged "victims" at any cost.

3.      After exhausting all other alternatives for money, Chandler used her long-term intimate and salacious relationship with Sheriff Stephen (details of which are outlined herein), and with a County Court Judge who participated in part of the criminal proceedings referenced herein.   Chandler targeted Dr. Khan because, in her own words, "he is a wealthy man" and as he was known for helping people in the community, and most likely would not refuse a meeting with her.

4.      The extortion scheme, more fully explained herein, included procuring an emergency restriction order restricting Dr. Khan's ability to practice medicine in Florida because he allegedly committed misconduct pertaining to Chandler and Campbell, and other imaginary patients all concocted by the defendants.  To pressure Dr. Khan to pay out settlements, these Defendants violated clearly established civil rights by procuring and participating in two distinct but related unwarranted *criminal prosecutions* in the Okeechobee County Court, procuring *two false arrests* of Dr. Khan, and by procuring

and assisting the DOH and its agents, maliciously and without due process of law, to restrict and/or hinder Dr. Khan's medical license on a temporary and permanent basis, as more fully explained in detail herein.

5. Former patient Teresa Chandler (Bishop) initiated this scheme by setting up a meeting with Dr. Khan, then misrepresenting the nature of that meeting, lied that she was Dr. Khan's patient to authorities, and then used her contacts and resources to seek compensation for what she alleged was "an unwanted touch."  She used her close confidant, Sheriff Stephen, as her primary resource.  Sheriff Stephen assigned his most trusted detective, Defendant Gonzalez, to be the lead in the case, so that he could liaison  with two trusted Okeechobee County prosecutors and agents of the DOH as well as lawyers hired by Chandler to promote a million dollar lawsuit.  In addition, Chandler convinced others to pose as fake victims, as more fully alleged herein, in hopes of monetary gain, while being coached by a well-known national law firm (*The Bloom Firm*), using the media, and convincing other friends who also falsified similar encounters to make it appear that Dr. Khan was a danger to patients and the community.

6. Following years of Dr. Khan enduring frivolous criminal, civil and administrative licensing proceedings, the lies became apparent.  One jury exonerated Dr. Khan in his first  criminal trial involving Chandler, while the prosecutors caused a mistrial in the second criminal trial which involved Campbell.  The prosecutors then dismissed that criminal case.  The DOH also rescinded the emergency restriction order once the former patients' falsities (promoted by actions of all defendants) became evident, but only after Dr. Khan suffered for 284 days under a severe restriction of his medical license, when his medical services were most needed due to the COVID pandemic.  The *Bloom Law Firm* also dismissed the civil lawsuit against Dr. Khan.  The DOH also failed to prevail in its frivolous administrative proceedings, and ended all proceedings on April 7, 2023.  The complex facts of this extortion scheme are more

fully alleged herein according to this time line below, and according to the outline in paragraph 22, *infra*.:

## TIME LINE

**2/24/2020**:    Defendant Chandler was served with divorce papers.

**2/25/2020**:    Chandler then requested a meeting with Dr. Khan in his office.

    Dr. Khan had a meeting with Chandler in his office in which Chandler later claimed that during this meeting, a criminal "battery" occurred vis-a-vis an unwanted touching.

**5/4/2020**:    70 days later, Chandler reported the accusation of the "battery" to Defendant Sheriff Stephen, a close confidant.

**5/6/2020**:    Law enforcement extracted the contents of Chandler's cell phone and conducted the first "controlled call" between Chandler and Dr. Khan..

**5/21/2020**:    A second recorded "controlled call" via Facetime was set up by law enforcement between Chandler and Dr. Khan.  Chandler did not deny that the encounter was consensual when speaking with Dr. Khan.

**5/29/2020**:    Sheriff Stephen called Dr. Khan directly on his cell phone to discuss the criminal investigation involving Chandler.

**6/18/2020**:    Chandler filed a formal written complaint with the DOH about her encounter with Dr. Khan and claimed she was his patient.

**6/19/2020**:    Dr. Khan was charged and arrested for a misdemeanor simple battery relating to Chandler.

**6/24/2020**:    A newspaper published the story about Chandler's allegation.

**6/25/2020**:    A television station aired the story about Chandler's allegation.

**6/26/2020**:    Chandler concocted a lie that there were ten additional "victims" and prosecutors directed Detective Gonzalez to investigate.  In addition, Chandler and others commenced a social media attack on Dr. Khan which lasted through 9/6/2020.

### TIME LINE continued

**7/6/2020**:       Campbell, a friend of Chandler, alleged that she too was battered by Dr. Khan as a patient (the last incident allegedly was 2/24/2020).

**7/13/2020**:     Florida Department of Health issued an Emergency Restriction Order ("ERO") against Dr. Khan.

**7/15/2020**:     Dr. Khan lost his hospital privileges, insurance contracts and was reported to the National Practitioner Data Bank ("NPDB") as a result of the ERO.

**7/31/2020**:     DOH commenced administrative revocation of medical license proceedings against Dr. Khan based on complaint filed by Chandler.

**8/18/2020**:     Dr. Khan was charged and arrested for a misdemeanor simple battery relating to Campbell.

**8/21/2020**:     Campbell was contacted by DOH resulting in a complaint against Dr. Khan.

**9/24/2020**:     Sheriff Stephen again  called Dr. Khan directly on his cell phone and wanted to know why Dr. Khan's counsel had reached out Chandler's ex-husband to discuss the criminal investigation.

**10/16/2020**:   Trent was contacted by DOH and a complaint was then filed against Dr. Khan.

**11/2/2020**:     The Chandler DOH administrative complaint was heard by an administrative law judge ("ALJ").

**12/4/2020**:     Dr. Khan voluntarily participated in a polygraph test for both the Campbell and Trent matters and was cleared with a 95% and 99% probability of innocence, respectively.

**1/22/2021**:     Chandler and *the Bloom Firm* filed a civil suit against Dr. Khan and his medical group.

**3/1/2021**:       The ALJ found that Chandler's testimony was not credible and any interaction between Chandler and Dr. Khan was as acquaintances, hence the ALJ found the complaint lacked merit and dismissed it

**TIME LINE continued**

**4/9/2021**:     The Board of Medicine upheld the ALJ determination.

**4/15/2021**:   Campbell was deposed and revealed text messages that exposed the collusion between Campbell and Chandler.

**4/19/2021**:   Prosecutors learned from a DOH medical expert that the allegations by Campbell did not constitute  battery under acceptable medical practices.

**4/23/2021**:   The DOH lifted the ERO after the Board of Medicine upheld the ALJ determination.

**5/16/2021**:   *The Bloom Firm* dropped their demand for a settlement to $500,000, which was rejected by Dr. Khan.

**7/8/2021**:     Prosecutors were put on notice by letter about inconsistencies in the Chandler and Campbell prior testimony and the motives for extortion.

**8/10/2021**:   Chandler criminal trial took place in Okeechobee County Court.

**8/11/2021**:   Dr. Khan was acquitted by the jury in the Chandler criminal trial.

**8/23/2021**:   The Board of Medicine, on the DOH recommendation, dismissed the Campbell administrative complaint.

**9/23/2021**:   Administrative law judge dismissed the Trent complaint filed with DOH (which was ratified by Board of Medicine on 11/3/2021) based on Trent's conflicting testimony.

**12/14/2021**: Campbell criminal trial commenced in Okeechobee County Court.

**12/15/2021**: Trial judge declared a mistrial in the Campbell criminal trial due to prosecutors' prejudicial statements during closing arguments.

**12/28/2021**: Board of Medicine dismissed Trent administrative complaint.

**2/1/2022**:     Chandler and *The Bloom Firm* dismissed the civil suit against Dr. Khan and his medical group and no payment was made to Chandler.

**7/22/2022**:   Prosecutors dismissed Campbell criminal charges against Dr. Khan.

**4/7/2023**:     DOH administrative proceedings were resolved in favor of Dr. Khan.

## JURISDICTION

7.  This is an action for injunctive relief and for monetary damages, to redress Defendants' deprivation of Plaintiff's rights, secured to Plaintiff by the laws and Constitution of the United States and the State of Florida. This action arises under 42 U.S.C. § 1983 for which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and the pendent state claims arise under Florida law.

8.  Attorneys' fees and costs are sought pursuant to 42 U.S.C. §1988 where applicable.

9.  All acts of Defendants and their agents have been taken under color of state law except where noted, and their acts were also fairly attributable to the State.

10. All material acts occurred in Palm Beach County and Okeechobee County, Florida, and elsewhere in the State of Florida, and in the Southern District of Florida.

## PARTIES

11. Plaintiff SAEED AKHTAR KHAN (hereinafter referred to as "Dr. Khan") is an adult resident of Palm Beach County, Florida, and is a licensed medical doctor in the State of Florida, having been issued license number ME77602. Dr. Khan has been a licensed physician since 1999 in Florida and for the last 24 years has practiced medicine in Okeechobee, Florida. He is board certified in internal medicine.

12. Defendant NOEL E. STEPHEN (hereinafter referred to as "Sheriff Stephen") is sued in his official capacity as Sheriff of Okeechobee County ("OCSO"), and was/is the duly elected Sheriff pursuant to Florida law, and at all material times was the Sheriff of Okeechobee County. He is also sued in his individual capacity for the tortious acts alleged herein, as is a resident of Okeechobee County, Florida.

13. Defendant JAVIER GONZALEZ ("Gonzalez") is an adult resident of Okeechobee County. Defendant Gonzalez is sued in his individual capacity and is an adult resident of Okeechobee County. He is also employed by OCSO as a deputy sheriff with the rank of sergeant.

14. Defendant TERESA CHANDLER ("Chandler"), formerly known as TERESA

BISHOP, is an adult resident of Lake County, Florida.

15. MONIQUE TRENT ("Trent") is an adult resident of Okeechobee County but is not a defendant.

16. DINA CAMPBELL ("Campbell") is an adult resident of Okeechobee County but is not a defendant.

17. CHERYL GRIFFIN ("Griffin") is an adult resident of Palm Beach County but is not a defendant.

18. Defendant JONATHAN S. HENDRICKS ("ASA Hendricks"), an adult resident of Okeechobee County, is sued in his individual capacity for the tortious acts alleged herein, and at all times was an assistant state attorney supervised by Defendant Bakkedahl, and a member of the Florida Bar since 2014.

19. Defendant ASHLEY K. ALBRIGHT ("ASA Albright"), an adult resident of Okeechobee County, is sued in his individual capacity for the tortious acts alleged herein, and at all times was an assistant state attorney supervised by Defendant SA Bakkedahl, and a member of the Florida Bar since 1997.

20. Defendant THOMAS BAKKEDAHL ("SA Bakkedahl") is sued in his official capacity as the elected State Attorney of the Nineteenth Judicial Circuit pursuant to Section 27.01, Florida Statutes, and was responsible for the acts of ASA Hendricks and ASA Albright pursuant to Section 27.18, et seq., Florida Statutes. He is an adult resident of Martin County, Florida.

21. All acts herein were taken under color of law and/or done maliciously, as more fully described herein.

22. The material facts herein are complex, and divided into the following sub-parts:

■ **A. How Defendant Teresa Chandler's Close Relationship to Okeechobee County Sheriff Stephen Furthered the Extortion Scheme**

■ **B. How Chandler's Close Relationship with Okeechobee County Judge William Wallace Furthered the Extortion Scheme**

- C. How Chandler Used a Meeting with Dr. Khan to Promote the Extortion Scheme

- D. How Chandler Furthered the Extortion Scheme during the Initial 70 Day Planning Period with the Aid of Co-Conspirators

- E. How the Defendant Prosecutors and Law Enforcement Ignored Exculpatory Evidence to Further the Extortion Scheme

- F. How the Defendant Prosecutors Furthered the Extortion Scheme by Their Involvement in the Investigation Leading to the Issuance of the ERO

- G. How Sheriff Noel Stephen Furthered the Extortion Scheme

- H. How Chandler Furthered the Extortion Scheme When She Reported her False Allegations to the Florida Department of Health

- I. How the Events of June 26, 2020 Involving Additional Fake Victims Furthered the Extortion Scheme

- J. How the DOH Investigators and Lawyers Furthered the Extortion Scheme by Promoting the Issuance of the Emergency Restriction Order (ERO)

- K. How Chandler's Baseless Civil Lawsuit Furthered the Extortion Scheme

- L. How Chandler's Enlistment of Fake Victim Dina Campbell Furthered the Extortion Scheme

- M. How Defendant Prosecutors' Joint Involvement in both the Investigation of Campbell and the Campbell Criminal Case Furthered the Extortion Scheme

- N. How Chandler's Enlistment of Fake Victim Monique Trent Furthered the Extortion Scheme

- O. How all the Defendants Furthered the Extortion Scheme with Defamatory Statements by Their Media Blitz

- P. How all Defendants Furthered the Extortion Scheme by Abusing the

Process Involving the Emergency Restriction of Medical License via DOH

■     Q.     How all Defendants Actions in the Extortion Scheme Caused Damages to Dr. Khan

## FACTS

23.     The facts set forth herein are a recitation of facts applicable to each count, and are presented so that the entire circumstances of the extortion conspiracy is explained. Plaintiff Dr. Khan was the Chief Executive Officer/President of Gateway Medical Group, LC, located in Okeechobee, Florida.  Chandler was a former patient of Dr. Khan but ceased being his patient in April 2019 when she voluntarily left this medical practice.   Chandler knew of Dr. Khan's stellar reputation in the Okeechobee community and his wealth associated with his long-standing medical practice.

24.     Chandler had relevant personal relationships with at least two government officials in Okeechobee County, including elected Sheriff Stephen, and elected Judge William Wallace, a county court judge in Okeechobee County, who was her formerly her legal counsel and "close friend" as more fully explained herein.  As shown herein, Sheriff Stephen used his personal connections and the power of his office to promote Chandler's extortion scheme that included promoting the Chandler prosecution, the Campbell prosecution, and the Department of Health administrative revocation proceedings, as more fully alleged herein.

25.     Some details of her relationships with these government officials are revealed in a series of text messages located on Chandler's Apple Iphone that were extracted in May 6, 2020 as part of litigation referenced herein.[1]   Defendants Gonzalez, ASA

---

[1]  The references to Chandler's text messages herein were obtained by law enforcement officials who downloaded data from Chandler's Iphone via Cellebrite, but the data obtained only dated from August 2017 through May 6, 2020, when Chandler went to Sheriff Stephen to report the allegations.  Chandler was unaware at that time that her entire phone contents were downloaded, including conversations with persons other than Dr. Khan.  The cell phone data was thereafter organized and translated by an expert

Albright, and ASA Hendricks each possessed the contents of all of the text messages referenced herein, and therefore knew of the close relationship between Chandler and Sheriff Stephen, Chandler's plan to extort Dr. Khan, Chandler's need for money due to her pending divorce, and Chandler's recruitment of fake victims, as more fully alleged herein.

A.     **How Defendant Teresa Chandler's Close Relationship to Okeechobee County Sheriff Stephen Furthered the Extortion Scheme**

26.    Sheriff Stephen and Chandler have known each other for over 20 years.  As early as January 16, 2018, Sheriff Stephen texted Chandler: "I like having someone to spoil," whereupon Chandler responded: "And you do a great job at it!! . . . You da bomb." Sheriff Stephen then replied: "Thank you !!!!" The texts between Sheriff Stephen and Chandler are attached as ***Exhibit 1 (composite exhibit of text messages between Chandler and Sheriff Stephen).***

27.    In other text messages that same day, Sheriff Stephen referred to Chandler as his "dream girl" and Chandler referred to Sheriff Stephen as "dream boy" and "spanky."

28.    Chandler worked at Waste Management in its public relations division. Waste Management is a national company serving as the exclusive waste collector in Okeechobee County, and also operating a landfill.

29.    The relationship between Chandler and Sheriff Stephen was so close that, at her

---

witness using Cellebrite software.  Plaintiff has limited access to post-May 6, 2020, text messages between Chandler and Sheriff Stephen.  Personal conversations between Chandler and Sheriff Stephen found in this download started as early as August 4, 2017, when Chandler texted Sheriff Stephen: "I hope your calls are not recorded." *See Exhibit 1.*  No audio, video recording, or voice mail messages were retrieved during this download. Dr. Khan also filed a separate Petition for a Temporary Preservation Order in the 19th Judicial Circuit, in and for Okeechobee County, to preserve the contents of Chandler's cell phone date. *See* Case No. 472020CA000159 (*Khan adv. Chandler*).  In addition, Chandler provided additional text messages between her and Sheriff Stephen in pending litigation in state court, and those text messages are also referenced herein.

request, Sheriff Stephen even provided jail inmate labor from the Okeechobee County jail, which he controlled and operated, when she so requested in 2018 and 2019, arguably in violation of Florida state law (Section 951.10, Fla. Stat.), which prohibits the use of inmate labor for private projects.

30.    The first request by Chandler was started by a text message on July 12, 2018, at 6:23pm when she requested a "few trustees that can help me plant" so that the back garden could get "back in shape" and wildlife re-certification at the landfill. This garden was an integral part of Chandler's public relations job duties at Waste Management. On July 13, 2018 at 1:30pm, Sheriff Stephen texted Chandler back: "special lady gets special treatment." The second request by Chandler was started by a text message on June 4, 2019, followed by another text message on June 18, 2019, where Chandler was told by Sheriff Stephen to coordinate butterfly garden planting in the city park with "Gary" who was in charge of trustees at the Okeechobee County Jail. *See Exhibit 1*.

31.    Public records obtained from OCSO have confirmed the use of Okeechobee County Jail inmate labor for this "butterfly" project, along with other private projects relating to Chandler and other OCSO employees, all for non-public purposes.[2]

32.    In a text message exchange on February 25, 2019, Sheriff Stephen responded to Chandler acknowledging that she received a card from him when she stated: "You are a true treasure/ I just got your card. Thank you." Sheriff Stephen replied: "Love you, miss you and think about you often!!!!" Chandler then replied: "Then rent me a room and get me out of jail. Lol." Sheriff Stephen texted Chandler: "I have a room at my house and a huge hug just for you." Chandler replied: "Are you gonna hide me? . .

---

[2] On Sheriff Stephen's website *okeesheriff.org*, he claims the following: "From his first day on the job, Sheriff Stephen has stressed the importance of treating all members of our community with respect, being transparent with and accountable to the individuals that the Okeechobee County Sheriff's Office serves, and creating an environment that recognizes and rewards character, competence and compassion."

.lol," whereupon Sheriff Stephen responded: "Absolutely along with several other fun things!!!"

33.     In a text message exchange on September 16, 2019, Sheriff Stephen, in response to a text from Ms. Chandler, responded: "I will do anything you ask of me!!!"  Chandler responded: "Careful now... I just might blind fold you so you don't know what you are doing."

34.     On September 25, 2019, Chandler and Sheriff Stephen again texted: "love you dream" and "love you dream boy." In those same text messages, Sheriff Stephen and Chandler exchanged sexual innuendos such as "yummy!!!," "bad boy bad boy whatya gonna do?" and "make her smile and gasp multiple times."

35.     Chandler and Sheriff Stephen continued their romantic relationship through 2020 as evidenced by a text Chandler sent to Sheriff Stephen on April 16, 2020, where they made fun of her surgical scar from her recent surgery and she suggested that she needed to work in his prison, as more fully alleged herein.

36.     When Sheriff Stephen was later called out about his sexual personal relationship with Chandler while under oath in a criminal trial involving Dr. Khan, he denied it during his testimony on August 10, 2021, as more fully alleged herein.

37.     Chandler also texted Sheriff Stephen with special requests related to his official position as Sheriff, such as inquiring about and obtaining police reports relating to relatives (*see texts of May 22, 2018 in Exhibit 1*) and Chandler's own admission in a text that she had this "direct link" to the Sheriff.

38.     In a series of texts in June 2018, Chandler sought advice from Sheriff Stephen regarding her  drug addicted daughter.  On June 5, 2018, Sheriff Stephen texted to Chandler: "Anything for you!!"

39.     Sheriff Stephen would also check in on Chandler about her medical needs in March 2019, based on a series of texts sent by him to her.  In one text on March 13, 2019, Chandler complained that she could not get an appointment at the Mayo clinic,

whereby Sheriff Stephen responded: "Well who needs to be tased, arrested or beat up to get it done??"

40.     Sheriff Stephen was prepared to do anything for Chandler.  As shown herein, he used his power of office and persuasion to help Chandler promote two malicious prosecutions and the issuance of an order restricting his medical license.

41.     In April 2019, Chandler texted Sheriff Stephen: "I need a yes on that ask please . . . I believe you know who he is . . ." in referring to a request for the Sheriff to recommend that a friend's son receive a scholarship.

42.     On June 4, 2019, Sheriff Stephen texted Chandler "Checking on you lady," whereupon Chandler explained her medical problems and use of several doctors, and Sheriff Stephen replied: "They realized they had a ANGEL on their hands with you!!!"

43.     On June 8, 2019, Chandler texted Sheriff Stephen: "Don't you have a room for the homeless.  I am up for adoption" whereupon Sheriff Stephen responded: "Oh don't I wish."

44.     On August 20, 2019, Sheriff Stephen texted Chandler inquiring: "You sun bathing naked again??" whereupon Chandler replied with smiley face emojis, and Sheriff Stephen then replied with a smiley face and sunglasses emoji.

45.     On August 23, 2019, Chandler texted Sheriff Stephen regarding a phone call involving a social security scam.  Sheriff Stephen replied: "Scam!!!!  But I'll arrest you!!!" whereupon Chandler replied: "Only if you will give me chocolate everyday..." Sheriff Stephen replied again: "Sounds good."

46.     On October 17, 2019, Chandler again texted Sheriff Stephen inquiring about helping her with setting up a booth at the Okeechobee annual musicfest, whereupon Sheriff Stephen replied: "anything for dream girl."

47.     On December 14, 2019, Chandler texted both Sheriff Stephen and Corporal Jack Nash in a group chat asking for assistance in removing property from her residence as part

of her break up with husband Tony Bishop. Nash gave Chandler advice on why she should have remained at her residence "at least once or twice a week." When Chandler married Tony Bishop she placed her name on the title of his property.

48.   Sheriff Stephen also texted Chandler that same day: "That's still marital abode and property. You have the right to be there." At this point, Sheriff Stephen knew that Chandler was going to be divorced, and so he helped her develop a way to find a "pay day."

49.   Sheriff Stephen made it clear to Chandler in these text messages that he would use the power of the Sheriff's office to assist her with this civil matter involving her divorce.

50.   Chandler later texted a "Antionette Rodriguez" on January 3, 2020, relating to her dispute with her husband: "Did I tell you I had to have the Sheriff involved bc he was threatening to have me arrested if I went there." She also stated: "I set up a meeting with Noel [Sheriff Stephen] and showed him the text and he called him and said he wasn't allowed to keep me off the property and I could ram the gate or break a window if I wanted."

51.   On January 30, 2020,  Chandler texted her husband Tony: "You don't remember the sheriff calling saying I have 24/7 access to the house and property until divorce?"

52.   Chandler then texted Sheriff Stephen after this text to her husband: "Morning Sheriff!! I forgot to tell you that I was unable to get my items from his house on the 28th as planned..." Chandler also explained in that text: "Tony is being terrible difficult so I told him we will just figure it out in court. I'm not even able to work and he hasn't offered one dime toward expenses. I chose the wrong cowboy... lol." *See Exhibit 1.*

53.   Sheriff Stephen then responded that same day to Chandler's text: "I will be praying for you and wishing you good health soon!!!. Miss you!!! Love you!!!" *See Exhibit 1.*

54.   The first incident that led to civil and criminal proceedings between Chandler and Dr.

Khan took place on February 25, 2020, as more fully explained herein.

55.    For example, Chandler texted Sheriff Stephen on April 16, 2020, relating to a scar from her recent surgery, claiming that: "I kinda look like I was in a bad neighborhood. Lol" Sheriff Stephen promptly replied:

| | |
|---|---|
| Sheriff Stephen: | Awwwww!!! Miss your face and hugs too!!! Let's think of a cool tattoo to compliment that!!! |
| Chandler: | Then I'll have to work at the prison... |
| Sheriff Stephen: | We will make it sexy. |

*See Exhibit 1.*

56.    There are over 1,312 text messages between Sheriff Stephen and Chandler over a three year period, all of a personal nature. *See Exhibit 1 (composite exhibit of text messages between Chandler and Sheriff Stephen).* There are no text messages between Sheriff Stephen and Dr. Khan.

57.    Sheriff Stephen had every reason to deny his relationship with Chandler, because it would undermine the entire "criminal investigation" and reveal his motives to promote this extortion conspiracy. Nonetheless, Sheriff Stephen denied this relationship under oath. At Dr. Khan's criminal trial on August 10, 2021, involving Chandler as the alleged victim of a misdemeanor battery, as more fully explained herein, Sheriff Stephen was cross-examined about this personal relationship with Chandler:

Q:    Okay. Well, we'll go into Dr. Khan in a second; but with her [Chandler], it's more than just one of the people from your county. You've worked with her on a board; you've communicated with her over several years?

**A.    *No different than the relationship with your client, sir.*** (Emphasis added)

58.    ASA Hendricks and ASA Albright knew of the personal relationship between Sheriff Stephen and Chandler, but successfully convinced a trial judge that any such relationship was not relevant to the criminal charges, as more fully explained herein.

59.   For example, ASA Hendricks and ASA Albright  objected during the Chandler
      criminal trial arguing that the jury should not know about the true relationship
      between Chandler and Sheriff Stephen based on the text messages dealing with her
      divorce and obtaining access to the marital residence, among other favors, or any of
      the details of the sexual nature of the Chandler-Sheriff Stephen relationship.  Defense
      counsel argued that the relationship was evidence of  the scheme to extort Dr. Khan
      by fabricating the non-consensual nature of the encounter.

**B.   How Chandler's Close Relationship with Okeechobee County**
      **Judge William Wallace Furthered the Extortion Scheme**

60.   Chandler was also a former client of, and a current friend of William Wallace
      ("Wallace"), both when Wallace was a lawyer and then when he became the
      Okeechobee County Court judge in 2018.

61.   Wallace knew Chandler was married to Tony Bishop and had changed her last name
      from "Chandler" to "Bishop" because of his professional and personal relationship
      with her, as a lawyer and confidant.

62.   A text message on June 21, 2018, confirmed the attorney-client relationship between
      Wallace and Chandler.  Additional text messages on July 30, 2018 and October 16,
      2018, also confirm this relationship.   On September 19, 2018, Wallace texted
      Chandler: "This year at music fest, get some some more of that morphine!! Also
      going to make certain my phone is fully charged.  Get video there will be." *See
      Exhibit 2 (composite exhibit of text messages between Wallace and Chandler)*.

63.   On May 1, 2019, in a series of text messages between Wallace and Chandler, Wallace
      texted to Chandler "I thought we broke up," "done hurt my feelings," whereupon
      Chandler replies "you cray cray lol . . . Ok I am better.  Don't make me stalk you,"
      whereupon Wallace immediately replied: "Please!!"

64.   At this point on May 1, 2019, Wallace was the Okeechobee County court judge whose
      investiture was on February 22, 2019.  Chandler requested from him a referral for a

medical/disability attorney and then texted a similar request to him on May 23, 2019, whereupon Chandler offered to pay Wallace fees to help her with a denial of insurance coverage by Cigna. *See Exhibit 2.*

65.   Based on Chandler's text messages with friends and her discussions with Judge Wallace, she knew that Dr. Khan had malpractice insurance covering his medical practice, as she had contemplated suing him and other doctors for prior medical treatment. Yet, she was advised that those lawsuits would be fruitless.

66.   Chandler had contemplated suing Lawnwood Regional for medical malpractice, and had sought the advice of Wallace for that lawsuit as well, based on her text messages.

67.   As explained more fully herein, Wallace signed the initial arrest warrant on June 19, 2020, for Dr. Khan's arrest involving Chandler as the "victim" for a misdemeanor battery charge under Section 784.03(1), Fla. Stat. He signed the arrest warrant despite his personal relationship with Chandler as her prior lawyer and personal intimate friend. ***See Exhibit 3 (Arrest Warrant).*** Dr. Khan was then arrested at the OCSO by a self-surrender involving Gonzalez.

68.   When called out on this conflict of interest by Dr. Khan's counsel in a motion filed by Dr. Khan on September 28, 2020, by explaining the presence of the aforementioned text messages, Wallace incorrectly stated that he had previously advised the parties of his relationship.

69.   Only upon Khan's counsel confronting Wallace of a conflict of interest in this written motion did he then recuse himself from criminal proceedings involving Chandler and Dr. Khan, by issuing a written order on or about October 2, 2020.

C.   **How Chandler Used a Meeting with Dr. Khan to Promote the Extortion Scheme**

70.   Chandler had been Dr. Khan's patient from 2005 through April 2019, when she changed doctors. Between April 2019 and September 13, 2019, there was no communication between Chandler and Dr. Khan, but on September 13, 2019, Chandler sent Dr. Khan a Facebook message which was not responded to.

71. Chandler later attempted to change her status from a former patient of Dr. Khan when she lied to state authorities and law enforcement officers that she was Dr.Khan's current patient. This fact would be critical to an administrative hearing by the DOH seeking to revoke Dr. Khan's medical license.

72. The Facebook message was followed by a text to Dr. Khan's phone on September 23, 2019. Dr. Khan relented and met with her in his office during his lunch break the next day. She requested to return as a patient but Dr. Khan turned her down. Chandler also discussed her impending divorce and asked for his advice. After the September 24, 2019 meeting, there was no communication between Chandler and Dr. Khan until February 19, 2020.

73. Chandler posted on Facebook on or about February 19, 2020, that she was in Miami for a diagnostic medical procedure, whereupon Dr. Khan responded to the Facebook post by wishing her well. Chandler responded to the Facebook message by asking if she could visit Dr. Khan's office, but he did not respond to this request.

74. Chandler had consulted friends and divorce counsel who advised her that due to her limited contributions during the short marriage to Tony Bishop, she would not gain a windfall and would receive little or nothing of financial value from the divorce.

75. On February 24, 2020, Chandler was served divorce papers from her then current husband, Tony Bishop. At this point, Chandler was in a dire financial state, as her expected windfall of half of Tony Bishop's assets had not occurred, there was no payout from her potential medical malpractice lawsuits, and the approval for her long term disability was still pending. In addition, Chandler had just been notified that she had been terminated from her job at Waste Management.

76. On February 25, 2020, Chandler again asked Dr. Khan via text for a meeting about her divorce, and he agreed to such a meeting. Her text stated: "…seeking older, wiser advice."

77. Chandler also texted Dr. Khan about other topics: the "redo" of her surgery, and that

she had lost her job at Waste Management.

78.    Dr. Khan instructed Chandler that he would be available at 4pm at his office in Okeechobee, Florida, on February 25, 2020, as he and his mid-level providers had over 60 patients that day.

79.    The meeting with Chandler took place on February 25, 2020, in Dr. Khan's administrative office adjacent to the nearby staff work stations in the front of his medical facility.  Other staff members were present at the facility at the time.

80.    At this meeting, Chandler did not bring any medical results or documentation related to her upcoming scheduled surgery, but instead brought the divorce papers she had received the day prior.

81.    At this meeting, Chandler told Dr. Khan that she was concerned over receiving a paltry financial award in the divorce, and wanted to know if he could help.

82.    Chandler's purpose for the meeting was solely to extort Dr. Khan.  She requested the meeting, initiated the encounter by exposing her breasts, and later admitted during her second controlled called that she wanted to wait until after surgery to "take it further."

83.    In the controlled call, Dr. Khan clearly reminded Chandler that their encounter was consensual.  He told her that if she had said "no" he would have been a gentleman and walked away. Dr. Khan also asked Chandler "why not go back to Billy," who was her usual hookup.

84.    Chandler later claimed in statements to law enforcement officials and state investigators that Dr. Khan battered her during this 30 minute meeting by an unwanted touching of her exposed breast.

85.    Chandler waited 70 days to formally report this allegation to law enforcement, first texting Sheriff Stephen on May 4, 2020.   She waited even longer to report it to the Florida Department of Health ("DOH"), as more fully explained herein.

86.    Dr. Khan did not contact Chandler during this 70-day period despite Chandler's expectations to the contrary.

87.   Chandler neither complained of, nor disclosed this alleged battery to at least fourteen (14) friends that she had contact with on her phone within the 24 hours after the alleged incident, nor did she text anyone about it during that 70-day time period.

D.   **How Chandler Furthered the Extortion Scheme during the Initial 70 Day Planning Period with the Aid of Co-Conspirators**

88.   In the 70-day time period between February 25, 2020 and May 4, 2020, Chandler formulated an *extortion scheme* to extract money from Dr. Khan as the pending divorce had worsened her debt situation and she believed that Dr. Khan would not voluntarily assist her financially without being coerced.

89.   During the 70-day period, Chandler sought and received  advice from a retired high-ranking Lieutenant from the Palm Beach County Sheriff's Office, Fred Deloreto ("Deloreto"), in the form of various voice and text conversations.

90.   Additionally, Chandler was coached by her attorneys at *The Bloom Firm*, a national law firm specializing in obtaining large sums of money for alleged sexual harassment, that she needed to file a criminal complaint in order to bolster her chances of receiving a settlement by either Dr. Khan or his practice's insurance carrier.

91.   Chandler was also advised to follow *the Bloom Firm* playbook, which involved a "social media blitz" designed to convict Dr. Khan in the court of public opinion, followed by a demand for mediation, the demand for signing of a non-disclosure agreement, and a monetary settlement.

92.   *The Bloom Firm* shakedown technique ignores truth and instead focuses on embarrassment, such that it aims to convince litigants like  Dr. Khan to settle cases to avoid public humiliation.

93.   Chandler then used social media and mainstream media to further denigrate Dr. Khan in the court of public opinion, as more fully alleged herein.

94.   ASA Hendricks enabled Chandler in her endeavors by first invoking  Florida's *Marsy's Law*, which is designed to shield from the public the names of alleged victims

of crimes.  The law, enacted by a Florida constitutional amendment effective January 2019, was designed to provide confidentiality and fair treatment for victims.

95.    ASA Hendricks first invoked *Marsy's Law* on Chandler's behalf on June 25, 2020, by having the criminal court file sealed.   The purpose was to keep her information confidential during the criminal proceedings.

96.    However, Chandler wanted to go public and solicit "additional victims" so she asked ASA Hendricks to revoke the order of confidentiality entered under *Marsy's Law*.  In fact, ASA Hendricks had already received requests from the media, including news reporter Terri Parker with WPBF News Channel 25, for disclosure of all of the evidence in the pending criminal cases.

97.    ASA Hendricks obliged Chandler's request to revoke her anonymity under *Marsy's Law* when on August 25, 2020, he sought to unseal the court file and obtained an order from Judge William Wallace, Chandler's friend and former lawyer, so that Chandler could "go public" soliciting other alleged victims who wanted to share in a potential settlement.  Judge Wallace signed an order allowing Chandler to speak freely.

98.    A news conference was held thereafter, and newspaper articles were published, in which Chandler and others provided denigrating information about Dr. Khan.  In addition, ASA Albright made comments to the press about the prosecution, and provided the press with evidence from the pending case that would otherwise been exempt from disclosure of Chapter 119, Florida Statutes, as more fully explained herein.

99.    Chandler's desire to go public is consistent with the shakedown practice utilized by *The Bloom Firm*, as it targets well known individuals with the threat of making public accusations against them. The truth of the accusations is secondary to the primary goal of making the target pay up.   ASA Hendricks and ASA Albright assisted in the extortion scheme by promoting the public frenzy to find additional victims, as did

Sheriff Stephen.

100.   For example, one of Chandler's lawyers, Arik Fidulli, Esq., ("Fidulli")  asked for other alleged victims to come forward and report Dr. Khan in an article in the *Okeechobee News* published on June 24, 2020.

101.   In furthering this extortion scheme, Fidulli also spoke on TV29, a local television station, on June 25, 2020, asking for other "alleged" victims to come forward.  None did.

102.   Shortly thereafter, Chandler invoked *Marsy's Law*, as she had accomplished her goal of publicly humiliating Dr. Khan.

103.   Chandler was also advised by her lawyers that she had to maintain that she was a current patient in order for Dr. Khan's insurance carrier to consider paying a settlement for the alleged incident.

104.   Chandler's advice from Lt. Deloreto is revealed in a series of salacious and racist text messages between Chandler and Deloreto during this planning period.

105.   Prior to reporting the encounter to law enforcement during the 70-day time period, Chandler joked with Deloreto about the alleged incident.

106.   For example, in one text message between Chandler and Lt. Deloreto during this 70-day time period, the following conversation was exchanged:

4/22/20 at 8:38 pm:

*Deloreto:*      *"I have your back ... and no I don't know him" "Since he had your front."*

*Chandler:*      *"Ha ha ha"*

4/22/20 at 8:40pm:

*Deloreto:*      *"I'll call… FaceTime your ass tomorrow.  Since that's your back and he has your front."*

*See Exhibit 4 (composite exhibit of text messages between Chandler and Deloreto).*

107.   Lt. Deloreto also directed Chandler to meet with Sheriff Stephen in a text message

dated April 23, 2020:

*Deloreto:*      *"Call him . . . talk to him and ask him."*

*Chandler:*      *"The Sheriff?"*

*Deloreto:*      *"Sure. Ur buds with him aren't you?"*

*Chandler:*      *"Yes."*

108.    It was at this point that Sheriff Stephen took part in the extortion scheme, by speaking with Chandler about her plan to extort money from Dr. Khan, and by him offering her the same type of assistance he had given in the past when Chandler needed favors.

109.    Lt. Deloreto then texted Chandler on May 5, 2020, his advice on how to explain to law enforcement why she delayed in reporting the alleged incident with Dr. Khan:

*Deloreto:*      *"just tell them as best as you can everything you remember and how it's stuck with you ever since... also you need to tell them the reason you've hesitated to report (his influence in the community) . ... . but the sleepless nights and shitty dreams along with wanting to prevent this from happening to others prompted reporting it now."*

*See Exhibit 4.*

110.    Foreshadowing Chandler's maliciousness in subsequent proceedings, Lt. Deloreto also texted Chandler 25 minutes later on May 5, 2020 that she should avoid making it known that she was engaged in an extortion scheme:

*Deloreto:*      *"...but listen... you might wanna ask Fronrath [an attorney]... personally, I'd avoid mentioning to the detective that you're speakin to an attorney about this...* **don't wanna give him the thought you're in this for monetary gain..."** (Emphasis added).

111.    That same day Lt. Deloreto texted Chandler another message which indicated the frivolity and sensationalism of her false claims:

*Deloreto:*      *"as for the tv thing…. If they decide to do a movie…insist on Courtney Cox to play you…"* whereupon she responded *"I like Demi Moore*

*better."*

*See Exhibit 4.*

112.   Chandler and Lt. Deloreto then formulated a plan on how to present the false facts to law enforcement without revealing the extortion scheme.  This  racist text message was sent on May 5, 2020:

Deloreto:        ***"listen... you just have to insist the primary reason you're doing this is for your own sanity and peace of mind as well as prevention of other victims... otherwise they'll try and portray you as someone trying to extort the sand negro... hehe."*** (emphasis added).

*See Exhibit 4.*

113.   The term "sand negro" is a racial slur against dark skinned person of south Asian (Pakistani or Indian primarily) as well as Middle Eastern persons, such as Dr. Khan.[3]

114.   Chandler's plan was now set in motion.  Following Lt. Deloreto's advice in earlier text messages, Chandler texted Sheriff Stephen on May 4, 2020:

Chandler:        "My attorney just told me I need to make a sexual assault complaint report tomorrow. Do I do that with you or who?"

*See Exhibit 1* (composite text messages between Sheriff Stephen and Chandler).

115.   Sheriff Stephen responded just three minutes later via text:

Sheriff:          "Hello lady!!! Either come to office or see one or call one to house. Assuming it happened here."

Sheriff Stephen also texted:

Sheriff:          "Start with deputy then it will go to a detective."

116.   Sheriff  Stephen  responded  to  Chandler's  text  by  assigning  OCSO  Detective

---

[3]  The Urban Dictionary defines "sand negro" as a polite way of saying "sandnigger,"  which is defined as a derogatory term for people typically of Middle Eastern decent, used mainly as a racist insult.
https://www.urbandictionary.com/define.php?term=Sand%20Nigger

[Defendant] Javier Gonzalez to follow up after Deputy Reno handled the initial intake of the complaint. At the time, Gonzalez was a sergeant in the OCSO detective bureau and a trusted and loyal deputy who worked for and with Sheriff Stephen for more than two decades and reported directly to Sheriff Stephen, and was seeking promotion to lieutenant.

117. Gonzalez set up a formal video-taped interview on May 6, 2020 with Chandler, wherein she acted nonchalantly about what happened.  For example, during this interview, Chandler refused Gonzalez's offer to consult with  the "victim-witness coordinator" nor did Chandler show any emotions about the alleged incident.

118. Chandler spoke about Dr. Khan in derogatory terms when Chandler repeated a slang term during this recorded interview between her and Gonzalez on May 6, 2020, but used the term "sand nigger" instead of "sand negro" which Deloreto used to describe Dr. Khan in an earlier text when he prepped Chandler for her interview. *See Exhibit 2.*

> Chandler:   "Then I -- someone way back I had heard them said, oh, he's the mafia of the Gateway Medical. *He's like the top dog that runs all these other little – pardon me -- sand niggers in town.* He's the top dog." (Emphasis added).

119. In addition to ratcheting up her allegations and submitting a complaint to the Florida Department of Health ("DOH"), Chandler along with Sheriff Stephen and ASA Hendricks and ASA Albright also attempted to procure new false claimants/victims to put more pressure on Dr. Khan to give up and pay up, as more fully alleged herein.

120. Sheriff Stephen and Gonzalez never fully investigated any of these fraudulent claims by the false claimants/victims, and also knew that the encounter between Chandler and Dr. Khan was consensual, and therefore not criminal, as more fully explained herein.

E.    **How the Prosecutors and Law Enforcement Ignored Exculpatory Evidence to Further the Extortion Scheme**

121.    Once it was reported that Dr. Khan allegedly committed a crime, ASA Hendricks and ASA Albright began working closely with Sheriff Stephen and Gonzalez with the preliminary investigation, to ensure issuance of an arrest warrant.  In fact, ASA Albright requested on May 28, 2020, that the case be assigned to him.

122.    Gonzalez testified in August 2021, during the Chandler criminal trial, that when he downloaded Chandler's text messages on May 5, 2020, despite a diligent search, he was unable to locate any text messages between Dr. Khan and Chandler that were derogatory or inappropriate.  In essence, there was no text message evidence of inappropriate behavior between them despite thousands of pages of text messages between Chandler and other co-conspirators, as alleged herein.

123.    As part of the "criminal investigation" for this simple misdemeanor battery case, and at Chandler's insistence, Gonzalez set up "controlled calls" with Dr. Khan and coached Chandler on the calls about what to ask and how to say it, to make it appear that Dr. Khan had actually committed the crime of battery.   But OCSO did not routinely create these "controlled calls," particularly for minor crimes like misdemeanor battery.

124.    During that same interview on May 6, 2020, and on  Chandler's suggestion to Gonzalez, a controlled call was made to Dr. Khan.  Chandler made the call while in a room with Gonzalez. Prior to the call, Gonzalez instructed her to make sure that the incident seemed "unprovoked" and instructed Chandler on how to question Dr. Khan.

Chandler:    -- you hear that they take a call or you have me call him and try to trap all or whatever No, you don't do that?

Gonzalez:    We can do that. If you want to go that far, we can have you place a call to him.

Chandler:    Well, I'd prefer -- I mean he's not going to probably admit to it if you

bring him in, and he's not going to --

125. Dr. Khan did not make any incriminating statements during the secretly-recorded May 6, 2020 call.

126. In a subsequent second secretly-recorded controlled call done via Facetime on May 21, 2020 with Dr. Khan, Chandler, who was scantily dressed, attempted to get Dr. Khan to state that the event was not consensual, but because it was consensual, he did not.

127. Gonzalez and another agent from the OCSO were present during this Facetime controlled call. Off camera they instructed Chandler on what to say in an attempt to elicit specific statements from Dr. Khan.

128. During this recording on May 21, 2020, Gonzalez reminded Chandler that attorneys are involved and thus *"the more, the better."*

129. Dr. Khan did not make any incriminating statements during this secretly recorded call, and in fact, the conversation between him and Chandler is a clear first indication that the encounter between Chandler and Dr. Khan was only consensual.

130. Specifically, Dr. Khan stated during this Facetime controlled call to Chandler that he would have been a gentleman and walked away if she had declined.

131. Chandler did not deny to Dr. Khan during this video-recorded call that the encounter was anything but consensual, and in fact Chandler nodded her head in agreement. When Dr. Khan pointed out that she [Chandler] said he wanted to have sex after surgery, Chandler then wanted to change the subject and end the controlled call.

132. Gonzalez never memorialized the content of this second controlled call in any police report. Had he done so, there would have been a report that Dr. Khan claimed that the encounter was consensual and that Chandler did not deny that during that controlled call.

133. Sheriff Stephen also participated in a series of text messages with Chandler after the criminal investigation commenced. For example, Sheriff Stephen kept Chandler

personally aware of the investigation and what Gonzalez was doing. He informed her when Dr. Khan was actually going to be arrested. He advised her on whether additional charges could be brought, such as a felony battery on the elderly, or false imprisonment. He also discussed with Chandler the importance of her lawyers in the civil case, and why the criminal investigation would help her lawyers with their civil case for monetary damages.

134.   It was now obvious to Gonzalez and the Defendants that Chandler had lied about the consensual nature of her encounter based on her own non-reaction and her failure to correct Dr. Khan about his assertion that the encounter was completely consensual during this recorded controlled call.

135.   Other details of the encounter  clearly prove that Chandler visited Dr. Khan not as a patient but to set him up in an extortion scheme.  Chandler set up the meeting, she brought her divorce papers to Dr. Khan, she expressed a desire for monetary gain from her ex-husband, and she  opened up her own shirt exposing her breasts.

136.   The failure of Chandler to deny the consensual nature of the encounter during this recorded interview was the first clear evidence that Sheriff Stephen, Gonzalez, ASA Hendricks and ASA Albright knew or should have known that Chandler's encounter with Dr. Khan was consensual and not criminal in nature, but instead they ignored this fact.

137.   After Chandler terminated the Facetime call with Dr. Khan, she asked  Gonzalez, whom she referred to as "boss," "was that enough?," to which Gonzalez responded: "that's much better."

138.   The fact that Chandler did not deny to Dr. Khan that the encounter was consensual was never memorialized in any police report by Gonzalez, but the video recording was available to ASA Hendricks and ASA Albright to review, and ultimately provided to defense counsel.  Instead, in the report filed by Gonzalez, he indicated that during his interview with Dr. Khan on June 17, 2020, he asked Dr. Khan about

the controlled call, but he failed to include an important fact – that Chandler did not dispute that the encounter was consensual.

139.   Following the second call, Chandler used her relationship with Sheriff Stephen to make sure an arrest warrant was issued.  However, despite her personal and intensive involvement in the arrest and prosecution, the only criminal charge was simple battery, a misdemeanor.  Chandler knew that such a minor charge would have minimum monetary impact for her extortion scheme.

140.   On June 18, 2020, Chandler complained to the DOH hoping to involve them in convincing prosecutors to charge Dr. Khan with more than simple battery in order to improve her monetary payout.

141.   In addition to ratcheting up her allegations and submitting a complaint to DOH, Chandler along with Sheriff Stephen and ASA Hendricks and ASA Albright also attempted to procure new false claimants/victims to put more pressure on Dr. Khan to give up and pay up, as more fully alleged herein.

142.   All of the text messages referenced in the exhibits attached hereto were not only in the possession of Sheriff Stephen, Gonzalez, ASA Hendricks and ASA Albright at all material times, for review, but were purposefully ignored despite warnings.

143.   Gonzalez was put on notice in an email dated June 4, 2020, from Dr. Khan's attorney that: 1) there was no patient-doctor relationship between Chandler and Dr. Khan; 2) Chandler sought out the "older and wiser advice" from Dr. Khan based on her divorce and termination from employment; 3) Dr. Khan refused to take Chandler back as a patient; and 4) that the controlled call between Chandler and Dr. Khan indicated that the encounter between them was clearly consensual.

144.   Gonzalez ignored the email of June 4, 2020, from Dr. Khan's counsel about the lack of evidence, and proceeded with assisting in the prosecution.

F.   **How the Defendant Prosecutors Furthered the Extortion Scheme by
Their Involvement in the Investigation Leading to the Issuance of the ERO**

145.   SA Bakkedahl supervised ASA Hendricks and ASA Albright, while they pursued this prosecution of Dr. Khan, and he was personally advised of the inconsistency of Chandler's prior testimony, as well as credibility issues with another alleged victim, Campbell.

146.   The prosecution of Dr. Khan was not treated like other criminal cases. For example, ASA Albright wrote in an email to a co-worker on May 28, 2020: "When you get a misdemeanor battery e-warrant on Saeed Khan, please assign it to me. He is a well know local doctor, so I want to make sure it is handled correctly."

147.   Despite Chandler's refusal to deny the consensual nature of the encounter, Gonzalez still persisted with continuing the criminal investigation, at the insistence of ASA Hendricks and ASA Albright.

148.   On June 9, 2020, Gonzalez requested a warrant from ASA Hendricks and ASA Albright for Dr. Khan's arrest relating to the Chandler incident, but Dr. Khan was not arrested immediately.

149.   ASA Hendricks, however, advised Dr. Khan's legal counsel that he could provide a voluntary statement explaining the situation, which might convince his office not to file formal criminal charges. But in reality, the emails generated by ASA Albright at that time revealed that he was going to seek issuance of the arrest warrant regardless of any interview.

150.   On June 17, 2020, Gonzalez conducted a voluntary non-sworn video-taped interview of Dr. Khan with his lawyer Edward Reagan, Esq. present, so that Dr. Khan could tell investigators what occurred.

151.   Despite Dr. Khan agreeing that the touch of Chandler was done with her consent, on June 18, 2020, Gonzalez nevertheless again requested a warrant for Dr. Khan's arrest from ASA Hendricks and ASA Albright.

152.   On June 19, 2020, Dr. Khan was formally charged by ASA Hendricks with misdemeanor battery where it was alleged that Chandler was the victim.

153.   The arrest warrant was signed by Judge Wallace, Chandler's former lawyer and intimate friend, as more specifically alleged herein.

154.   On the same day, Dr. Khan self-surrendered on the arrest warrant to Gonzalez, he was detained, fingerprinted and photographed at the OCSO

155.   Dr. Khan paid a cash bond for his release, and as a result, his booking/arrest photograph became an indelible public record.

156.   ASA Hendricks and ASA Albright, as the prosecutors assigned to the case, knew or should have known about the relationship between Judge Wallace and Chandler, but failed to seek a recusal.

157.   On June 26, 2020, ASA Hendricks directed Gonzalez (with an email also copied to Sheriff Stephen and ASA Albright) to investigate ten (10) additional victims mentioned by Chandler during her call with ASA Albright, and also to interview Dr. Khan's staff.  Two of these alleged victims supposedly contacted the Okeechobee City Police Department.

158.   ASA Albright wrote to Terri Parker of WPBF Channel 25 news on August 31, 2020, while both criminal cases were pending against Dr. Khan,  that he would provide her the videotaped interviews of Chandler, the controlled recorded calls with Dr. Khan, the recorded interview of Dr. Khan, and advised her how to access Chandler's phone records.   Nonetheless, this was outside his scope as a prosecutor as Section 119.07(3)(d), Florida Statutes, exempts from public disclosure criminal investigative information as defined in the statute so long as it is deemed to be active – and at that time, both criminal cases were active.

159.   As explained more fully herein, another alleged victim (Campbell) claimed that Dr. Khan had inappropriately touched her after Chandler recruited her.  Thus, Dr. Khan would later face additional criminal charges as more fully alleged herein.

160.   ASA Hendricks regularly communicated with the lawyers handling the DOH proceedings against Dr. Khan.  For example, there was a conversation between ASA Henricks and Ryan Sandy, Esq., on September 21, 2020, by phone and email, about Chandler's confidentiality, and the accusation of additional victims.

161.   Before any criminal case proceeded to trial, Dr. Khan's defense counsel Edward Reagan, Esq., twice placed ASA Hendricks, ASA Albright, and SA Bakkedahl on clear notice of inconsistencies in evidence in the State's case.  First, on November 24, 2020, ASA Hendricks was informed in a concise email about inconsistencies in Chandler's testimony.

162.   Again on July 8, 2021, Dr. Khan's counsel sent ASA Hendricks a comprehensive six page outlining how the motive of extorting Dr. Khan by two alleged victims was clear, based on testimony and the text messages more fully referenced herein.  Mr. Reagan requested a meeting with them.

163.   SA Bakkedahl directed ASA Hendricks and ASA Albright to meet in order to discuss the contents of this letter.

164.   Despite these warnings provided by Dr. Khan's counsel, ASA Hendricks, ASA Albright, and SA Bakkedahl proceeded, at all costs, to prosecute Dr. Khan in both cases, and to also interject themselves in the investigations.

165.   During the Chandler criminal trial relating to those allegations, Dr. Khan took the stand on August 11, 2021. He described the encounter as consensual.

166.   Sheriff Stephen testified at Dr. Khan's criminal trial on August 10, 2021, falsely, that he did not have any relationship with Chandler that was "any different than his relationship with Dr. Khan." Sheriff Stephen's relationship with Chandler was clearly "different" in all the ways alleged herein, as this fact was clearly known by ASA Hendricks and ASA Albright based on over 1,312 text messages between Sheriff Stephen and Chandler over a three-year period of the phone download, all which revealed personal texts. See Exhibit 1 (composite exhibit of text messages between

Chandler and Sheriff Stephen). There were no text messages between Sheriff Stephen and Dr. Khan.

167. During the Chandler criminal trial, ASA Hendricks and ASA Albright consistently persisted and argued to the trial court successfully that it should exclude any evidence of the actual personal relationship between Sheriff Stephen and Chandler as being "not relevant" to the criminal proceedings, despite their review of the various text messages referenced herein.

168. At the end of the criminal trial involving Chandler, a unanimous "not guilty" verdict was rendered by a jury on August 11, 2021, which terminated those criminal proceedings in Dr. Khan's favor.

G. **How Sheriff Noel Stephen Furthered the Extortion Scheme**

169. The criminal prosecutions against Dr. Khan were furthered by Sheriff Stephen, who assigned Detective Gonzalez to the misdemeanor battery cases referenced herein. Chandler either directly through Sheriff Stephen, or by instructing Gonzalez, influenced the generation of the Investigative Report, and tried to make changes to it in order to have Dr. Khan charged with a more serious offense. Sheriff Stephen furthered these prosecutions due to his close relationship with Chandler in an effort to assist her in extorting funds from Dr. Khan.

170. Sheriff Stephen knew that Chandler's claim was false, but nevertheless exerted his influence as Sheriff to help Chandler extort Dr. Khan, just as he had done in the past, based upon under various "asks" revealed in the text messages. Chandler was assisted by Sheriff Stephen both directly and through Gonzalez in crafting the warrant. Chandler attempted to have Dr. Khan charged with false imprisonment and assault on a disabled person. Although Gonzalez attempted to convince the prosecutors to add these charges, he was unsuccessful.

171. As evidence of Sheriff Stephen's personal involvement, he had Dr. Khan's personal cell phone number and called him on May 29, 2020, even before his arrest, advising

him to retain counsel because a "person" had made a "formal criminal complaint" against him, despite the fact that no arrest had been made and the information was not yet public.  Specifically, Sheriff Stephen told Dr. Khan that the pending criminal charge was called simple battery and not sexual in nature, and that a "person" was insistent on a criminal charge being filed.  Sheriff Stephen also advised that he assigned a trusted detective, Gonzalez, to investigate the case, and for that reason, he needed to retain counsel immediately.

172.   Dr. Khan inquired of Sheriff Stephen whether this was a shakedown and Sheriff Stephen replied candidly that it is often less expensive and less embarrassing to settle "these issues" quickly.

173.   Dr. Khan took the call seriously and although it was a Saturday, he then contacted and employed criminal defense counsel to defend him against "the person's" allegation.

174.   Sheriff Stephen wanted to help Chandler extort money from Dr. Khan because of her poor financial situation, as he explained to her in previous texts on October 17, 2019: "anything for dream girl."   It was no different than his earlier texted to Chandler on September 16, 2019: "I will do anything you ask of me!!!"  *See Exhibit 1* (composite).

175.   Sheriff Stephen again improperly interfered with Dr. Khan's civil rights when he called him on his cell phone on September 24, 2020 at 5:15pm (after criminal charges had been formally filed and Dr. Khan was represented by counsel).

176.   During that call that lasted 7 minutes, Sheriff Stephen warned Dr. Khan that he should not get Chandler's ex-husband Tony Bishop involved in the defense of the case, because Sheriff Stephen he knew that part of Dr. Khan's defense was the extortion scheme which was motivated by Chandler's lack of financial resources as a result of her pending divorce.

177.   During this call between Sheriff Stephen and Dr. Khan, there was a discussion about the inaccuracies in the *Okeechobee News* newspaper article, which then prompted Sheriff Stephen to later text  Dr. Khan that he had nothing to do with the newspaper

article.

178.    Dr. Khan immediately considered Sheriff Stephen's message to be a threat, as he already had reviewed the text messages between Chandler and Sheriff Stephen and knew of Sheriff Stephen's "assistance" to Chandler during her divorce, such as the Sheriff's promise to help Chandler gain access to her residence, among other favors offered in Sheriff Stephen's official capacity as Sheriff.  Accordingly, Dr. Khan reported this incident to his counsel.

179.    Sheriff Stephen's contact with Dr. Khan was not only inappropriate but it also violated Dr. Khan's due process rights, and is further evidence of malice on the part of Chandler and Sheriff Stephen to pervert the criminal justice system at any cost.

180.    Throughout the criminal prosecutions referenced herein, Sheriff Stephen was intimately involved in Chandler's extortion scheme, either directly or through Gonzalez.  The involvement included the controlled calls, the preparation of the Investigative Report, the discussion of alternative criminal charges, and other discussions to help Chandler achieve financial gain at the expense of Dr. Khan.

181.    Chandler tried to have Sheriff Stephen change Gonzalez's Investigative Report to accommodate her attorney's requests., based on the following text message exchange:

Bishop: Dearest, I've tried to change my police report like 4 times....

Stephen: No changes can be made. Corrections and amendments can happen in supplement form. Javier [Gonzalez] can do that if he agrees with your changes.

Bishop: Ok. My attorney just asked that I have the few mistakes changed.

Stephen: No changes!!! Your civil attorney has all he or she needs.

182.    ASA Hendricks and ASA Albright copied Sheriff Stephen on some of their emails relating to their prosecution of Dr. Khan, and also had regular personal contact with him and Gonzalez.

**H.**   **How Chandler Furthered the Extortion Scheme When She Took her False Allegations to the Florida Department of Health**

183.   Although Chandler was not a patient of Dr. Khan during her visit on February 25, 2020,  her lawyers advised her to file a formal complaint with the Department of Health ("DOH") claiming she was an active patient to put further pressure on Dr. Khan to negotiate and settle, as the DOH had the authority to revoke Dr. Khan's medical license.  However, Chandler did not report to  Gonzalez on May 6, 2020, that she was Dr. Khan's patient.  She knew as early as May 26, 2020, that the maximum charge against Dr. Khan was simple battery, a misdemeanor, so by the time she contacted DOH she had decided to use other avenues to achieve her goals.

184.   The DOH has the power under Florida law, Section 20.43, Florida Statutes, to regulate health care practitioners pursuant to Chapter 456 and 458, Florida Statutes.

185.   On June 18, 2020, Chandler provided a sworn statement to the DOH as part of a complaint against Dr. Khan.

186.   The DOH and its agents then begin joint efforts with ASA Hendricks and ASA Albright, and others, to suspend and revoke Dr. Khan's medical license.

187.   Chandler admitted in a deposition that she filed the complaint with DOH because Dr. Khan had not yet been arrested.

188.   On or about June 23, 2020, Investigator Healy-Baez from DOH was assigned to investigate the case on behalf of the DOH.  She was a veteran investigator retired from the NYPD and had been employed by DOH for five years.

**I.**   **How the Events of June 26, 2020 Involving Additional  Fake Victims Furthered the Extortion Scheme**

189.   When Chandler found out that the criminal charge filed against Dr. Khan for the allged battery was merely a simple battery misdemeanor, she needed to find ways to put more pressure on Dr. Khan, so she attempted to expand the extortion to include other alleged fake victims.

190.    Chandler enlisted the aid of the DOH and agents of the State of Florida, including attorneys and investigators, to put pressure on Dr. Khan, which only added fuel to her pending criminal charge against him.

191.    On June 26, 2020, Chandler called Gonzalez and told him that she had 8 more "victims" come forward.  Gonzalez in turn informed her that ASA Hendricks had told him of 2 additional "victims" who had contacted the Okeechobee City Police Department ("OCPD") alleging that Dr. Khan was inappropriate.

192.    Chandler then falsely informed DOH Investigator Healy-Baez on June 26, 2020, initially by email and then by a follow-up phone call, that ten more "victims" came forward alleging a similar type of misconduct by Dr. Khan. Chandler did not provide names, dates of the incident, or any other details at that time.

193.    ASA Hendricks followed up with an email to Gonzalez later in the day on June 26, 2020 (and copied Sheriff Stephen), relating that he heard of these new alleged "victims" and ordered Gonzalez to follow up on an investigation of the new "victims" for possible additional future criminal charges against Dr. Khan.

194.    ASA Hendricks also directed Gonzalez in that e mail to interview Dr. Khan's staff to "try and verify any claims by Chandler or any other person regarding Dr. Khan's behavior during these alleged incidents."  However, Gonzalez failed to interview the staff and relied only on what Chandler told him earlier.

195.    As stated earlier the alleged 10 "victims" was the product of: 1) ASA Hendricks misinforming Gonzalez that he received a report from the OCPD of 2 additional victims who had encounters with Dr. Khan, and 2) both Chandler's lawyers in *The Bloom Firm* and Chandler informing ASA Albright, DOH, and Gonzalez that they knew of 8 additional "victims."

196.    Gonzalez later admitted in a deposition that on June 28, 2020, when he attempted to obtain the names of other victims, Chandler was the only source of this information and she could not provide details, not even the names of the so-called "victims."

197. When Gonzalez contacted OCPD on July 2, 2020, to obtain the identities of two alleged "victims" provided by ASA Hendricks, it twas then determined that those two alleged "victims" were never patients of Dr. Khan.

198. Gonzalez never communicated to the DOH that there were no additional "victims," but he admitted that in his interview with investigator Healy Baez in October 2020, he reiterated that there were additional "victims."

**J.    How the DOH Investigators and Lawyers Furthered the Extortion Scheme by Promoting the Issuance of the Emergency Restriction Order (ERO)**

199. The DOH also failed to independently investigate the "additional victims" allegations against Dr Khan, and to this date, have never found any "additional victims."

200. The Investigative Report submitted by DOH investigator Healy Baez consisted of phone interviews with Chandler and Gonzalez, the submission of the arrest warrant, and information provided by Chandler.

201. The DOH failed in its basic due process responsibilities as follows:

   •    Healy Baez portrayed Dr Khan's misdemeanor simple battery charge as if he was charged with felony sexual battery;

   •    Healy Baez failed to interview the staff who were in Dr. Khan's office the day of the incident with Chandler;

   •    Healy Baez failed to request or review the time cards, computer logs or any other objective evidence either directly from Dr Khan, his counsel or from the SAO or the OCSO to whom it was provided; and

   •    Healy Baez failed to verify or confirm the actual identity and existence of the ten other "victims" and instead relied solely upon Gonzalez and ASA Henricks and ASA Albright.

202. The DOH ignored an important part of the investigation of Chandler's complaint by the OCSO, as more fully alleged herein, which revealed during a secretly recorded Facetime call conducted by Gonzalez that Chandler and Dr. Khan did not have a

doctor-patient relationship at the time of the encounter and that Chandler tacitly agreed that their encounter was consensual.

203.   In the controlled calls, it was also made clear that Chandler was not Dr. Khan's patient at his medical practice during the time of the encounter. This evidence was ignored by DOH in later proceedings.

204.   Chandler later admitted to friends that attorneys from *The Bloom Firm* advised her that this civil case would be stronger if she convinced law enforcement to file criminal charges against Dr. Khan and if she located other patients to make similar allegations, and if she convinced the DOH to issue an ERO limiting Dr. Khan's ability to practice medicine, all of which would predictably result in a domino effect.

205.   Healy Baez's failure to perform these basic investigative duties (and the DOH lawyers' failure to insist on this basic investigation) resulted in irreparable harm to Dr. Khan it led to the drastic step of the emergency restriction of Dr Khan's medical license ("ERO") on July 13, 2020, followed by the filing of an administrative complaint to strip Dr. Khan of his medical license on July 30, 2020 as more fully alleged herein.[4]

206.   The ERO, entered by DOH officials on July 13, 2020, was immediately reported to the media. Dr. Khan learned of its existence through a story in the *Okeechobee News*.

---

[4] The purpose of a Florida DOH ERO is to protect the community from an immediate threat by a physician. The ERO bypasses the normal due process afforded to a physician by a Board of Medicine probable cause panel which evaluates if there is prima facie case for a disciplinary action. EROs which involve substance/ETOH abuse or mental illness have a path to resolution through the Physician Recovery Network. Remarkably, from January 1995 through December 2020, only a total of only eight (8) EROs were issued. There is no similar mechanism for a physician who is accused of misconduct, in which the DOH usually acts only after a criminal investigation results in a conviction. In cases where an ERO is issued in the absence of the above process, there are two options: 1) the DOH can lift or modify the ERO if new information comes to light; and/or 2) the accused physician can request an expedited hearing before a Florida Department of Administrative Hearing (DOAH) judge.

207.    The ERO substantially limited Dr. Khan's ability to practice medicine by prohibiting him from providing care to female patients even in the presence of a chaperone, and led to multiple losses including substantial income and other collateral consequences thereafter, as more fully alleged herein.

208.    More importantly, the DOH issuance of the ERO caused irreparable damage by alleging the false existence of these additional "victims" which was widely disseminated on social media and in the community.

209.    Accordingly, Dr. Khan was improperly portrayed as a serial predator  and therefore a "danger to the community" and against who emergency action had to be taken. This mischaracterization tarnished Dr Khan who was board certified, and a highly trained academic FSU School of Medicine appointed faculty physician who served an under-served rural area by choice since 1999.

210.    This all occurred despite Gonzalez and ASA Hendricks and ASA Albright knowing as early as July 2, 2020, that there were no additional "victims," but they purposefully failed to provide this information to agents of DOH, knowing that the ERO would place unbearable pressure on Dr. Khan to settle the civil claims.

211.    The ERO as expected, put additional pressure on Dr. Khan to settle Chandler's false claim that was now intentionally blown out of proportion.

212.    Gonzalez admitted under oath his failure to "set the record straight" with DOH in his deposition taken on October 13, 2020, and also admitted that it was a reckless act to provide a statement to DOH that other victims existed, without verification or corroboration.

213.    The ERO was finally lifted on April 23, 2021,  284 days after it imposed and only after Dr. Khan was cleared in the DOH proceedings.

**K.    How Chandler's Baseless Civil Lawsuit Furthered the Extortion Scheme**

214.    Prior to reporting the encounter to police, Chandler contacted an attorney, whom according to her text to Deloreto on May 5, 2020, informed her "*to file a police report*

*and let them know when it's done. They said even if I were laying there naked and signed a consent form that he cannot touch me.*" *See Exhibit 2 (composite).*

215.    Deloreto also told Chandler in the text message that she had to avoid the impression that she was making the allegation for monetary gain.  *See Exhibit 2 (composite).*

216.    Chandler also disclosed to Sheriff Stephen in a text message: "my attorneys told me I need to report it to law enforcement."  *See Exhibit 1.*

217.    As part of the planning for the extortion, Chandler consulted with the national prominent civil law firm (*The Bloom Firm*), as more fully alleged herein, to determine how she could sue Dr. Khan's malpractice insurance carrier and reap millions, just like the firm advertised it could do in media nationwide.

218.    *The Bloom Firm* touted on its website: "You don't need to be a celebrity or a CEO to have us fight for your legal rights and defend your interests." The firm's website flashes messages: "Our results speak for themselves . . . $35.5 million sexual harassment . . . $9.9 million sexual assault." www.https://thebloomfirm.com

219.    As a result of Chandler hiring *The Bloom Firm*, a letter was sent to Dr. Khan dated July 14, 2020, after his medical license was restricted by the ERO, demanding that Dr. Khan mediate a settlement and sign a non-disclosure agreement ["NDA"] within five (5) days.

220.    The issuance of the ERO resulted in significant economic loss to Dr. Khan, including loss of both leadership positions and medical staffing privileges at hospitals such as Raulerson Hospital in Okeechobee, Florida, the Cleveland Clinic and suspension of his teaching duties as an Assistant Professor of Medicine at the FSU School of Medicine.

221.    As a result of both the warrant and the ERO, Dr. Khan  lost his hospital privileges on July 15, 2020.  This was followed by the loss of all commercial  health insurance plans.

222.    Chandler made a demand of a payment of $500,000.00 through her counsel at *The*

*Bloom Firm* to resolve the case.

223.   As alleged herein, the *Bloom Firm's* tactics are well documented in litigation throughout the country.[5]

224.   Dr. Khan rejected all civil settlement offers and instead insisted on trials in both of the criminal matters to clear his name despite multiple written settlement attempts made by Sarah Bloom, Esq., and Fidulli.   For example, *the Bloom Firm* served a Proposal for Settlement to Dr. Khan under Rule 1.442, Florida Rules of Civil Procedure, in the amount of $350,000 on May 26, 2021, and in the amount of $150,000 to his medical practice, Gateway Medical Group LLC.

225.   Dr. Khan would not settle with the DOH, who had initially asked him to voluntarily surrender his medical license.  Instead, he insisted on an expedited hearing with an administrative law judge ("ALJ").

226.   After Chandler conferred with her attorneys at *The Bloom Firm*, Chandler sent texts to Campbell to persuade her to make up the false allegations against Dr. Khan.  For example, Chandler sent Campbell the following text on July 5, 2020:

"Detective Javier Gonzales (sic) is taking report. Do you mind calling him tomorrow with your story? And my attorney is *The Bloom Firm*. She is the daughter of Gloria Allred."

---

[5] For example, in *Marciano v. Bloom*, which involves a complaint for damages filed in the Superior Court of California for the County of Los Angeles, (Case No. 22STCV 14474), it was alleged that the firm's "practice is to target well known individuals …with accusations of improper behavior, typically under the guise of a purported sexual harassment claim, and threaten to make those accusations public. Whether the accusation is true or not does not matter.  What matters is making the target pay up."   The litigants in the *Marciano* case also alleged that *The Bloom Firm* "preys on targets knowing that most will pay exorbitant amounts of money just to avoid the embarrassment of having repulsive allegations associated with their name. And they rely on the fact that their targets will never fight back because doing so would necessarily require their targets to undergo this shame and embarrassment."

227. Chandler's lawyers filed a civil suit against Dr. Khan and his medical group in Okeechobee County circuit court on January 22, 2021, alleging damages in excess of $30,000. (Case No. 47 2020 CA 000010). At the time, Dr. Khan was on a ventilator having contracted COVID while administering care to sick male patients. Dr. Khan refused an any settlement offer. *See Counts IV and VII, infra.*

228. As shown herein, Chandler's lawyers later dismissed this civil lawsuit on February 1, 2022, but only after being threatened with sanctions under Florida Rules of Civil Procedure, for filing a frivolous case. The civil case was also dismissed by Chandler before her deposition was taken in that case. At first, *The Bloom Firm* wrote that it would settle the case only if there were mutual releases, but Dr. Khan refused the offer because the case was patently frivolous, based on the misrepresentation that Chandler was Dr. Khan's patient on February 25, 2020, and because of the baseless allegation that she was battered. That fact alone would have triggered potential coverage by Dr. Khan's malpractice insurance carrier, but it was false. *See Counts IV and VII, infra.*

229. Dr. Khan served Chandler and her counsel with his §57.105, Fla. Stat., motion claiming Chandler's allegations of sexual assault were false, and demanded that the lawsuit be dismissed within 21 days.

230. In response, Chandler and *The Bloom Firm* timely dismissed this civil case because their lawyers knew of significant exposure to §57.105 sanctions. Furthermore, Chandler's counsel certified to the court that there was "good ground to support" dismissal pursuant to Rule 2.515(a)(2), Fla. R. Jud. Admin.

**L.** **How Chandler's Enlistment of Fake Victim Dina Campbell Furthered the Extortion Scheme**

231. To bolster Chandler's allegations and increase pressure on Dr. Khan for a large settlement, Chandler enlisted phony victims. The first was Campbell, who made a frivolous claim against Dr. Khan.

232.    On July 6, 2020, during an interview with Gonzalez, Campbell alleged that Dr. Khan improperly placed his stethoscope on her left breast and cupped it with his hand while she was fully clothed.

233.    Campbell alleged the battery occurred on five different occasions between November 2019 and March 13, 2020, but provided no specific dates. Campbell however, reported that the last occurrence was February 24,2020 which was incidentally the day prior to when Chandler had alleged she was battered.

234.    At first, Gonzalez filed a report that this allegation was "informational" because he knew that the lack of specificity  would not justify an arrest warrant.

235.    Campbell then sent Gonzalez an email on July 28, 2020, in which she attached her medical records. She complained that Dr. Khan kept lowering her Adderall and Klonopin medications, which are both highly addictive Schedule II drugs that had been prescribed previously in doses exceeding FDA recommendations by another of her physicians.

236.    Following Chandler's lead, Campbell filed a Complaint with the DOH on August 21, 2020.   Based on Campbell's inconsistent testimony, this complaint was later dismissed by the DOH.

**M.    How Defendant Prosecutors' Joint Involvement in both the Investigation of Campbell and the Campbell Criminal Case Furthered the Extortion Scheme**

237.    Multiple communications between ASA Hendricks and ASA Albright illustrate a coordinated effort between lawyers for the DOH and *the Bloom Firm* to extort Dr. Khan.

238.    To further the Campbell-related criminal prosecution, on August 6, 2020, ASA Hendricks sought a recommendation from his colleagues at the State Attorney's Office in Fort Pierce for a medical expert, later to be Dr. Michelle Libman.

239.    In an email on August 4, 2020, to fellow prosecutors and staff at the State Attorneys' Office, ASA Hendricks stated the following in referring to Dr. Khan's second

criminal trial: "Since the first was filed additional victims have come forward with various claims and I am looking for a Medical Doctor that help determine what is a crime vs. medically permissible . . . FYI: I am looking for a doctor NOT from the Okeechobee area as we are trying to avoid running into issues of personal bias and local hospital politics."

240. Linda Baldtree, an employee in the State Attorney's Office, indicated in an email on August 6, 2020, that she had a good choice approved by [SA] Bakkedahl . . . a "female doctor . . . I doubt she has ever testified or done this before."

241. At that time, Dr. Libman had the exclusive contract to provide services to all Martin County employees and the Sheriff's Department, through the company ("Treasure Coast Urgent Care") that her husband, a former state attorney in Hendrick's office, then owned and operated. This contract was a substantial source of revenue for this company.

242. ASA Hendricks then contacted Dr. Libman through her husband, a former assistant state attorney who had worked in his office.

243. Dr. Libman never before testified as an expert and was not paid for her testimony.

244. Without reviewing medical records, or speaking to Campbell, ASA Hendricks asked Dr. Libman to opine that the fraudulent accusations made by Campbell would have constituted improper medical treatment (that is, the alleged manner of placement of the stethoscope on Campbell's chest).

245. After consulting with Dr. Libman, on or about August 10, 2020, ASA Hendricks instructed Gonzalez to request a warrant for Dr. Khan's arrest for battery as claimed by Campbell based on Dr. Libman stating that "it was the incorrect way to check for the heartbeat." Normally prosecutors do not tell law enforcement officers to request arrest warrants, but by doing so, they interject themselves into investigations.

246. Specifically, Gonzalez wrote in his incident report: "On August 10, 2020, I received information provided by a medical physician who stated that the manner in which

Saeed Khan conducted his physical examination of Ms. Campbell was not medically appropriate. The way he checked her heartbeat by placing the stethoscope over her breast and nipple and by cupping the breast was improper."

247. Gonzalez admitted in his October 13, 2020, deposition that he had neither contacted nor met with Dr. Libman and the only source of this information was ASA Hendricks.

248. On August 12, 2020, this incident report was submitted to the State Attorney's Office via eWarrants for review in the attempt to obtain a warrant for the arrest of Dr. Khan on the charge of Battery in violation of Section 784.03, Fla. Stat., which is a first degree misdemeanor punishable up to one year in jail.

249. The warrant was approved and signed on August 17, 2020 by Judge William Wallace, and thus on August 18, 2020, Dr. Khan was formally charged again by ASA Hendricks with battery, this time involving Campbell as the alleged victim.

250. Dr. Khan self-surrendered on the arrest warrant on August 18, 2020; he was again detained, fingerprinted and photographed by Gonzalez at the OCSO. He paid a cash bond.

251. Dr. Khan's counsel notified the prosecutors that it was improper to allege additional victims and inflame the public in the media. Nonetheless, ASA Hendricks informed Dr. Khan's counsel on or about August 21, 2020, that Chandler's civil counsel at *the Bloom Firm*, Ari Fudali, Esq., had been in contact with him, had signed up at least 10 victims, and that the newspaper story was not misleading.

252. On August 24, 2020, ASA Albright was contacted by Sam Howard, a reporter for the *Palm Beach Post.* ASA Albright wrote back to him in an email that he would "answer what I can" about the prosecutions of Dr. Khan.

253. Shortly thereafter on August 29, 2020, at the request of ASA Hendricks, Judge William Wallace signed an order unsealing the court docket so that Chandler could freely identify herself to the media and solicit additional "victims." The purpose of this "unsealing" was to facilitate ASA Hendricks' attempts to find additional accusers

to strengthen the Campbell and Chandler cases, and to apply more pressure of Dr. Khan.

254. On or about March 31, 2021, a new judge was assigned to the case who had just been appointed to the bench, Judge Rebecca White.

255. ASA Hendricks advised Dr. Khan's counsel that Judge White would be "perfect" to handle the case because she had supervised ASA Hendricks while they worked at the State Attorney's Office, and because she worked in the Special Victims Unit prosecuting sex crimes and was a prosecutor at the time that ASA Hendricks commenced the criminal prosecution. Dr. Khan's counsel disagreed and filed a motion to recuse her.

256. That motion to recuse Judge White was later granted despite Hendrick's hope to have what he considered "a favorable judge" preside over the case.

257. As a result of this arrest for the Campbell criminal case, Dr. Khan's booking/arrest photograph became indelibly a part of the internet.

258. A deposition of Dr. Libman was taken on January 21, 2021, and later she testified at Dr. Khan's criminal trial. Her close relationship to the State Attorney's Office and the fact that her company received a significant portion of its revenue from county contracts revealed in her deposition testimony.

259. Despite the apparent conflict of interest in using Dr. Libman as a witness, ASA Albright and ASA Hendricks insisted on placing her on the witness stand.

260. ASA Hendricks knew, at the time of the Campbell criminal trial, that at least one other expert/doctor had opined that the alleged actions of Dr. Khan, if true, were not criminal.

261. On April 19, 2021, ASA Hendricks corresponded with Dr. Fernando Jara, first in an email and then by phone, relating to the medical procedure of placing a stethoscope on a breast. Dr. Jara is an emergency medicine physician in Tampa, Florida and is affiliated with multiple hospitals in that area, and had been in practice for more than

20 years. Dr. Jara had done a comprehensive medical record review of Campbell at the request of the DOH attorneys.

262. Specifically, Dr. Jara advised ASA Hendricks that there was no deviation from the standard of care by Dr. Khan. In addition, he explained ASA Hendricks, as he explained to the DOH, that the allegation did not appear to be an inappropriate placement of the stethoscope.

263. ASA Hendricks learned from the DOH (Amanda Godbey) that, based on Dr. Jara's opinion, no battery had occurred and to charge Dr. Khan was inappropriate.

264. Despite this clearly exculpatory evidence and logical explanation for Campbell's medical treatments, ASA Hendricks continued with the prosecution and failed to disclose to Dr. Khan's counsel that he had obtained expert testimony from Dr. Jara negating the criminal charges.

265. ASA Hendricks knew that he could not present false testimony in a trial based on well-established caselaw set forth in the *Giglio* doctrine.

266. ASA Hendricks also knew that the *Brady* doctrine requires the State to disclose material information within its possession or control that is favorable to the defense. Under *Brady*, if the prosecution is aware of evidence that could help the defendant, that evidence must be shared with the defense. It was not shared and only discovered once the State Attorney's Office provided public records from the prosecution in January 2023.

267. ASA Hendricks also knew that he had a beholden compliant "expert" who was not familiar with the rudimentary requirements of expert testimony which required an unbiased review of the records and other supplemental material, at the very least.

268. Dr. Libman also was never informed by ASA Hendricks that an experienced physician which the DOH frequently used as an expert (Dr. Jara) had independently reviewed the records and did not find a deviation from the standard of care by Dr. Khan.

269. Later, Campbell testified at the criminal trial that: "[Dr. Khan] placed his stethoscope

on my nipple while cupping my breast," and the State's expert witness Dr. LIbman testified that this placement of the stethoscope on a fully clothed patient was improper medical practice.

270.  ASA Hendricks' response to Dr Khan's counsel rebuttal was not relevant to the misdemeanor charge and contained explicit statements comparing Dr. Khan to well-known celebrities who had been convicted of felony sexual misconduct, such as the disgraced gymnastics sports doctor Larry Nassar.

271.  The Campbell criminal case ended in a mistrial on December 15, 2021, as the trial judge was required by well-established law to grant Dr. Khan's motion for a mistrial based on this prosecutorial misconduct (the statements about Larry Nassar) that was designed to inflame the jury.

272.  ASA Hendricks nevertheless told the trial judge that he had "cleared" the use of the inflammatory comments for his closing arguments with his  supervisor, ASA Albright.

273.  The trial court refused to dismiss the charges on double jeopardy and/or prosecutorial misconduct grounds, thereby requiring Dr. Khan to prepare for a second criminal trial and expend time, expenses, and resources for that preparation.

274.  On the eve of the new trial set for July 22, 2022, ASA Hendricks entered a nolle prosequi in favor of Dr. Khan in the Campbell prosecution, which terminated the Campbell prosecution in Dr. Khan's favor.

275.  ASA Hendricks and ASA Albright knew that  Campbell had made a complaint to the DOH relating to her alleged contact with Dr. Khan, but that complaint was dismissed by the DOH on or about June 28, 2021, due to the DOH's acknowledgment of collusion between Campbell and Chandler.

276.  ASA Hendricks and ASA Albright knew that the dismissal was based on a series of text messages which were discovered when Campbell was deposed on April 14, 2021.

277.  Even with this clear and confirmed evidence of collusion between Campbell and

Chandler, ASA Hendricks and ASA Albright still proceeded with the Campbell criminal trial in December 2021, and when faced with a certain not guilty verdict, they deliberately caused a mistrial.

**N.** **How Chandler's Enlistment of Fake Victim Monique Trent Furthered the Extortion Scheme**

278.   To promote and expand the scope of the extortion once it was clear that there were not ten additional "victims," Chandler sought out  other willing fake co-conspirators, or phony victims to validate her claim.

279.   Monique Trent ("Trent"), a friend of Chandler, contacted *The Bloom Firm* upon reading a newspaper article published on June 23, 2020, which reported Dr. Khan's arrest.

280.   On June 26, 2020, Trent contacted Chandler to coordinate efforts in their extortion scheme.   Trent was to pose as a "phony victim" who was battered by Dr. Khan in his medical office sometime in October of 2015, but she could not pinpoint a date.

281.   On June 29, 2020, Trent called Gonzalez but was not able to connect with him and instead left a  voice mail. Gonzalez eventually called Trent back but she did not respond. Trent then filed an administrative complaint with DOH, Case No. 2020-31679, which triggered an administrative complaint to be filed on October 16, 2020.

282.   However, despite Trent claiming she was battered in October 2015, she actually continued as a patient in Dr. Khan's medical practice until November 2019 when she was terminated for being verbally abusive to a staff member during a visit

283.   Trent also failed to report to DOH that between October 2015 and November 2019 she had 25 more scheduled visits at Dr Khan's medical office.

284.   Trent hoped to also reap the benefits of a settlement and insisted on a criminal prosecution of Dr. Khan.

285.   Trent expected to follow the same pattern as Chandler in hopes of a large monetary settlement paid out by Dr. Khan. She was however unable to proceed with her plan

as the criminal and civil statute of limitation had run out and thus she was left with no option but to pursue the DOH complaint.

286.    To assist Chandler in the extortion scheme, Trent informed Chandler that she had information about Dr. Khan's defense strategy and wanted to share it with *The Bloom Firm*.   Specifically, she claimed that her 15-year-old daughter had overheard conversations between two of Dr. Khan's employees [TT and MC] during their extended family vacation, and that such information would harm Dr. Khan. She offered to have her daughter tell *the Bloom firm* attorneys about it.

287.    On July 13, 2020, Chandler then set up a phone conference between Trent, her daughter and *The Bloom Firm*, and then following the phone conference, Trent called Chandler with the update of that meeting.

288.    As a result of what Trent claimed she knew, DOH investigator Healy Baez was sent to Okeechobee on September 29, 2020, at the request of DOH Prosecutorial Services Unit [PSU] to interview Trent.   Ryan Sandy, Esq., an attorney for the DOH, contacted Trent to set up the meeting.

289.    Meanwhile, on December 4, 2020, Dr. Khan voluntarily submitted to a polygraph test about any of his interactions with the accusers, and there was a 99% probability that his version of the events was correct – that he never committed any battery or other improper conduct.

290.    The DOH proceeded on Trent's false complaint.  On May 14, 2021, the DOH petitioned to consolidate both the Trent and Campbell cases, and the consolidation was granted.  However, after the collusion between Chandler and Campbell was discovered by DOH, the Campbell charges were dropped by the DOH and it instead proceeded with the Trent complaint.

291.    Trent was deposed on July 6, 2021, in the DOH proceeding, but she could not consistently repeat her story (and its details) about the allegations against Dr. Khan.

292.    Dr. Khan testified at the DOH hearing that Trent first came to his office for treatment

in 2011 and was seen exclusively by his Physician Assistant ("PA") who was also Trent's sister-in-law.  He also testified that on October 15, 2015, he personally saw Trent so that she could refill her controlled substance prescription as there had been a family falling out between Trent and the PA. The visit lasted fifteen to twenty minutes and was conducted in an examination room at approximately 2:00 pm.

293.   As part of the manner in which the extortion scheme played out, Trent's testimony at the DOH mirrored Chandler's testimony because she alleged that Dr. Khan saw her late in the afternoon and like Chandler, she was the last patient of the day, after Dr. Khan allegedly had dismissed all his staff and invited her to his personal office to discuss her divorce. All of her claims were refuted by other evidence presented at the hearing.

294.   Trent's testimony was found to be materially lacking in details of the alleged events. Accordingly, the Administrative Law Judge ("ALJ") dismissed Trent's complaint by Order on September 23, 2021, as being unfounded due to the lack of clarity and inconsistencies in Trent's testimony.

295.   Chandler's recruitment of Trent was done to fortify her chances of a large settlement, and to put  further pressure on Dr. Khan in the DOH proceedings. It also fueled the defamation alleged herein.

296.   The Board of Medicine [BoM] agreed with the ALJ's recommendation and dismissed the Trent administrative complaint on December 28, 2021.

**O.    How all the Defendants Furthered the Extortion Scheme by Their Media Blitz**

297.   *The Bloom Firm* had a proven strategy of using the ***#metoo*** movement as a pressure tactic to force settlements without having to go to trial.  The law firm used platforms such as Twitter, Instagram and Facebook, as well as the mainstream media to denigrate and prosecute individuals in the court of public opinion.

298.   In hopes that Dr. Khan would succumb to the pressure and pay a settlement, Chandler also used media sources to attack Dr. Khan.  This is a proven tactic of *The Bloom*

*Firm*, as they use various public platforms to disseminate the false allegations and make them appear as fact to force settlement talks after a non-disclosure agreement is signed.

299.   Chandler's job at Waste Management was in public relations. She used those connections and her friendship with Kathy Womble from the Okeechobee News to have a favorable article published on June 23, 2020 where her attorney, Fidulli, from *The Bloom Firm* solicited other alleged victims to come forward.

300.   Chandler previously provided news reporter Ari Hait from News Channel 25 with stories over the years about Okeechobee County.  Hait returned the favor with a biased TV interview that aired on June 24, 2020, in which Chandler, accompanied by her attorney from *The Bloom Firm*, falsely accused Dr. Khan of assault.

301.   To further promote the extortion scheme, Chandler enlisted the aid of Cheryl Griffin and Trent to further denigrate Dr. Khan's reputation in the court of public opinion and pressure Dr. Khan to pay a settlement.

302.   As a result, Griffin published libelous and salacious posts about Dr. Khan following Chandler's allegations to law enforcement:

**"Saeed Khan is a predator!" [a/k/a sexual predator.]**

**"There's many more victims and they need to go to the police."**

**"PLEASE IF YOURE A VICTIM REACH OUT, CRIMINALLY."**

**"He's been doing this for 20 + years."**

**"He is a menace to society."**

**"#SupportVictims.", and**

**"DeportSaeedKhan."**

*See Exhibit 7 (Griffin posts)*.

303.   On or about the same time on June 26, 2020, Trent also attacked Dr. Khan on social media with similar allegations and continued to do so through September 6, 2020.

304.   On or about July 13, 2020, *The Okeechobee News* published an article which was

subsequently posted on its web page.   The article referenced the DOH ERO [Emergency Restriction Order] and made the false allegations appear as "fact" that ten more women accused Dr. Khan of similar offenses as those alleged by Chandler.

305.   On July 19, 2020, Trent texted Chandler:

*"We know the truth. OCSO, state attorney and medical licensing board are currently offering the support and we had the opportunity to make that known to the public. He revealed his kryptonite in that post. His attorney does not want this to be in the media they know how damaging public opinion will be to his defense".*

306.   On that same date other text communications occurred between Trent and Chandler after Dr. Khan posted a response to the allegations on his medical practice FaceBook. These texts included conversations where Trent asked Chandler about anonymously contacting media outlets. Chandler responded that she had no problem doing that. She also texted that her attorneys had advised her not to initiate or be quoted as the attorneys were concerned about defamation charges being brought against Chandler. Chandler concluded by offering to help in any way.

307.   On or about August 28, 2020, the *Palm Beach Post* reprinted the false claims as if they were proven facts and further linked Dr Khan's former public service as a town commissioner.

308.   The *Miami Herald* published the same false claims on October 20, 2020, as "proven facts,"and referenced the ERO, which furthered public opinion against Dr. Khan, damaging his reputation.

309.   On or about November 13, 2020,  the *Palm Beach Post* reported on the Trent DoH Administrative Complaint, and in doing so, presented the Chandler and Campbell allegations as if proven facts, and also reprinted the ERO misrepresentations, which furthered public opinion against Dr. Khan, damaging his reputation.

310.   Chandler intended the media campaign to persuade Dr. Khan to settle.   This defamation campaign included convincing the DOH to revoke Dr. Khan's license for

the acts alleged by various accusers.

311. The publication of these false statements linger today and continue to tarnish and defame Dr. Khan's personal and professional reputation even after he was exonerated of such claims made by these defendants.

**P.   How all Defendants Furthered the Extortion Scheme by Abusing the Process Involving the Emergency Restriction of Medical License via DOH**

312. As part of the extortion scheme, the quickest way to put pressure on Dr. Khan was to restrict his ability to earn a living.

313. The DOH, in conjunction with all defendants herein, issued an ERO based on inaccurate information that were additional "patients" who had accused Dr. Khan of misconduct, as more fully alleged herein.

314. The DOH assigned investigators and attorneys completely mismanaged the investigation. They did not independently verify any of the statements, or even verify the identity of the ten accusers, or the discrepancies in statements and in the investigation led by Sheriff Stephen and Gonzalez.

315. The ERO alleged that the victims were abused during "examinations" in Dr. Khan's office and that "ten other patients have spoken out regarding Dr. Khan being inappropriate with them during office visits."   The term "inappropriate" was never explained.

316. The ERO had the effect of portraying Dr. Khan as a serial predator and a danger to the community against whom immediate action needed to be taken.

317. In addition to the ERO being disseminated in the media, the ERO was reported to the National Practitioner Data Bank, which resulted in Dr. Khan being stripped of his various hospital privileges and cancellation of the insurance contracts.

318. On July 31, 2020, as a consequence of the ERO, the DOH issued an Administrative Complaint against Dr. Khan.   The complaint charged Dr. Khan with violating Florida statutes by engaging in sexual misconduct with a patient.

319.    ASA Hendricks sent an email on August 4, 2020, to Elizabeth Hughes, who worked for the DOH and inquired about the additional victims he had seen mentioned in a Miami Herald news article.  These were the same fictitious victims that Chandler had told DOH investigator Healy Baez and ASA Albright about on June 26, 2020, and referenced in the ERO.

320.    As the DOH never conducted their own an independent investigation, they relied upon the OCSO and ASA Hendricks and ASA Albright for the "facts" obtained in the criminal investigation to justify their own investigation. This enabled Chandler and her associates to control the narrative by supplying the various agencies false information such as the misrepresentation that went to Dr. Khan's office as a patient to discuss surgery, among other misrepresentations.

321.    When Dr. Khan's counsel responded and raised serious questions about the alleged "facts" and nature of the  relationship between Chandler and Sheriff Stephen, it was ignored.

322.    Dr. Khan hired separate counsel to defend himself vigorously in the DOH proceedings.

323.    As Dr. Khan continued to refuse to accede to  Chandler and *the Bloom Firm*'s monetary demands, they increased the pressure on Dr Khan.  For example, Chandler sent an email to ASA Hendricks on August 24, 2020, falsely alleging that Dr. Khan was violating this ERO by seeing female patients.  ASA Hendricks took the bait.

324.    ASA Hendricks then contacted DOH lawyers to further put pressure on DOH to take action against Dr. Khan for this alleged violation, knowing that such action would weaken him and make it more likely that he would enter a guilty plea in the criminal cases, or better yet, pay off the alleged victims – Chandler and Campbell.

325.    Hendricks' call to the DOH caused the following DOH actions:

■    Patients were called at home to inquire if Dr. Khan had violated the ERO;

■    Dr. Khan's staff was called and harassed by DOH attorneys;

- Investigators scheduled phony female patient appointments to be treated by Dr. Khan, which would have been a violation of the ERO if he took for the bait;

- Investigators misused their authority and accessed the DEA scheduled data base to look for violations; and

- DOH lawyers filed a petition in the circuit court to compel Dr. Khan to provide patient charts which they had previously tried to obtain under false pretenses, all of which ultimately shows that Dr. Khan never violated any provision of the ERO.

326. All defendants promoted the false notion that there were additional victims, but ASA Hendricks kept particularly close contact with agents of the DOH to promote this falsity.

327. After Dr. Khan's counsel forced the DOH to expedite Dr. Khan's administrative case via a Writ of Mandamus, the required final hearing was held by the Division of Administrative Hearings (DOAH) from November 2-4, 2020.

328. During Chandler's testimony at this final hearing, she claimed that during the encounter with Dr. Khan she discussed her upcoming surgery. This testimony was inconsistent with Chandler's prior sworn testimony and prior sworn statements. It was also inconsistent with Chandler's prior written narrative description of the meeting with Dr. Khan. Her testimony at the final hearing was deemed not credible by the tribunal, and was clearly aimed to abuse the process by giving DOH jurisdiction over Dr. Khan.

329. Ultimately, Dr. Khan defended himself in the DOH actions, and as a result, the administrative actions by the DOH were dismissed by an administrative law judge ("ALJ"), and subsequent appeals by the DOH were fruitless, resulting in a *final resolution of all DOH actions in favor of Dr. Khan.*

330. The ALJ ultimately found in her final order of March 1, 2021, that Dr. Khan's status as a physician was irrelevant to the encounter on February 25, 2020, because Chandler was not a patient of Dr. Khan's during the encounter.

331. On November 6, 2020, Dr Khan's counsel filed a motion to modify or lift the ERO, by clearly outlining the erroneous allegations behind the ERO.  This motion was ignored by DOH.

332. Chandler not only misrepresented her "patient" status, but also misrepresented to DOH on or about June 26, 2020, that there were a total of 10 additional "victims" of Dr. Khan.

333. The ERO was then lifted on or about April 23, 2021, more than 284 days after it was improperly issued.

334. Although ASA Hendricks and ASA Albright were advised about Chandler's false testimony in an e mail sent to ASA Albright on July 16, 2021, by Dr Khan's counsel, they both nonetheless proceeded with the Chandler criminal trial.

**Q.   How all of the Defendants Actions in the Extortion Scheme Contributed to Dr. Khan's Damages**

335. Dr. Khan has expended over one million dollars ($1,000,000.00) defending himself in all aspects of this extortion scheme referenced in detail herein, including expenses for the following:

  1.   Counsel for representation in the two criminal cases (and costs associated with the prosecutions) as more specifically described herein;

  2.   Expenses for experts to review and interpret the data on Chandler's Iphone as referenced in footnote 1, *supra*.;

  3.   Counsel for representation in the DOH/ERO proceedings (and costs associated with defending against the ERO) as more specifically described herein;

  4.   Expenses related to clearing Dr. Khan's name and reputation due to the negative publicity relating to the arrest and false accusations, particularly in terms of what is available to be seen on the internet;

  5.   Counsel for representation in frivolous related civil cases as more fully described herein (*Counts IV and VII*);

6.      Medical expenses including costs for therapy to deal with the emotional trauma caused by the false allegations;

7.      Expenses incurred in the civil and criminal litigation, including deposition transcript expenses;

8.      Lost wages and other economic opportunities associated with Dr. Khan's medical license, including:

a) Loss on insurance contracts due to the ERO;

b) Loss of hospital privileges and wages due to the ERO; and

c) Loss of teaching opportunities at FSU Medical School due to the ERO.

9.      Damage to his reputation and standing in the community; emotional distress, and physical distress caused by emotional distress; and

10.     Expenses incurred in attempting to get reinstated at the hospitals and into health plans.

**COUNT I**

**(42 U.S.C. § 1983: Malicious Prosecution
as to Defendants Stephen, Chandler, Gonzalez, individually -
the Chandler Criminal Prosecution)**

336.   Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, as fully set forth herein, and specifically as to this Count, paragraphs 70 through 144.

337.   42 USC § on 1983 provides a cause of action against any person who, "under color of" state law, deprives another of their rights, privileges, or immunities secured by the Constitution."

338.   The constitutional right at issue in this case is grounded in the Fourteenth Amendment's Due Process Clause, which provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

339.   The Due Process Clause "entitles a person to an impartial and disinterested tribunal in both civil and criminal cases"—or, stated differently, it imposes a "requirement of neutrality in adjudicative proceedings." *Marshall v. Jericho, Inc*., 446 U.S. 238, 242, 100 S.C. 1610 (1980).

340.   This rule of impartiality derives from the common law, which has long recognized the principle that "[n]o man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." *The Federalist No. 10*, at 59 (J. Cooke ed. 1961); *see also*, e.g., Edward Coke, *1 Institutes of the Laws of England* 141 (12th ed. 1738).

341.   The Due Process Clause constitutionalizes the judicial-impartiality requirement because, the Supreme Court has explained, it is among "those settled usages and modes of proceeding" that comprise "due process of law." *Tummy v. Ohio*, 273 U.S. 510, 523, 47 S.C. 437 (1927).

342.   On or about June 19, 2020, Gonzalez, acting under color of state law and acting as a law enforcement officer employed by OCSO, deprived Plaintiff of his rights guaranteed by the United States Constitution, (as recognized in 42 U.S.C. § 1983), in that Defendant arrested Plaintiff for the offense of battery, which then participated in the prosecution thereafter pertaining to Chandler.

343.   Gonzalez acted at the behest of Sheriff Stephen, ASA Hendricks, and ASA Albright, as more fully alleged in paragraphs 118-141, and 154,  all under color of state law.

344.   All government defendants acted under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the office of Defendant Sheriff Stephen and the Office of the State Attorney for the Nineteenth Judicial Circuit.

345.   This Count is being brought against Defendants Sheriff Stephen, Chandler, Gonzalez, in their individual capacities, pursuant to U.S.C. Amendments IV & XIV, 42 U.S.C. § 1983 and § 1988.

346. These defendants are the legal cause of the prosecution, the prosecution had a bona fide termination in Dr. Khan's favor, there was an absence of probable cause for the prosecution, and there was malice on the part of each of the Defendants.

347. Malice is inferred by unique and common facts applicable to each Defendant.

348. As to Defendant Sheriff Stephen, malice is implied by: 1) his personal and sexual relationship with Chandler, which he misrepresented under oath in a court proceeding, 2) his knowledge that Judge Wallace, his own acquaintance and also known "close friend" of Chandler, would sign Dr. Khan's arrest warrant, 3) his personal attempts to interfere directly with Dr. Khan's due process rights by calling him twice despite Dr. Khan being represented by counsel, and impliedly threatening him, 4) his assignment of the case to his close associate, Gonzalez, and 5) his desire to make sure Chandler was compensated by Dr. Khan, which could have been more easily accomplished once additional victims were developed.

349. As to Defendant Chandler, malice is implied by: 1) her personal relationship with Sheriff Stephen, 2) her material misstatements to law enforcement about whether she was a patient of Dr. Khan, and whether the acts were consensual, 3) her active promotion of the notion that additional victims existed when none existed, 4) her use of ASA Hendricks and ASA Albright to further her vengeance on Dr. Khan, 5) her direct participation with the DOH in its investigation aimed to revoke Dr. Khan's medical license, and issue the ERO, and 6) her collusion with Trent and Campbell and Griffin to put further pressure on Dr. Khan publicly.

350. As to Gonzalez, malice is implied by: 1) his personal relationship with  Sheriff Stephen, 2) his deliberate ignorance of facts that would lead a reasonable person to believe that Dr. Khan's acts with Chandler were consensual and not criminal based on the controlled Facetime call referenced herein, 3) his instructions to Chandler during the controlled calls to act flirtatious; 4) his direct participation in creating false facts that additional victims existed when none existed, 5) his purposeful failure to

advise DOH that he could not verify "additional victims," 6) his reliance on requests from ASA Hendricks and ASA Albright to request an arrest warrant for Dr. Khan, 7) and his direct participation with the DOH in its investigation aimed to revoke Dr. Khan's medical license, and issue the ERO.

351.   All of these Defendants' acts were recklessly or deliberately indifferent to the constitutional rights of Plaintiff.

352.   42 U.S.C. § 1983 provides a remedy for violation of these rights.

353.   As a direct and proximate result of the acts and omissions of all the Defendants, Plaintiff suffered damages including past, present, and future emotional and physical distress, embarrassment, humiliation, shame, damage to his good name and reputation, the expense of defense fees and other expenses associated with the prosecution, all of which exist to this day and will continue in the future, and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(1)   award compensatory damages against all Defendants named in this Count;

(2)   award reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

(3)   award such additional or alternative relief as may be just, proper and equitable; and

(4)   grant a jury trial on all issues so triable.

## COUNT II

### (42 U.S.C. § 1983: Malicious Prosecution
### as to Defendants Stephen, Gonzalez, ASA Hendricks and
### ASA Albright, individually - the CAMPBELL Criminal Prosecution)

354.   Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, as fully set forth herein, and specifically as to this Count, paragraphs 231 through 277.

355.  42 USC § on 1983 provides a cause of action against any person who, "under color of" state law, deprives another of his or her rights, privileges, or immunities secured by the Constitution."

356.  The constitutional right at issue in this case is grounded in the Fourteenth Amendment's Due Process Clause, which provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

357.  The Due Process Clause "entitles a person to an impartial and disinterested tribunal in both civil and criminal cases"—or, stated differently, it imposes a "requirement of neutrality in adjudicative proceedings." *Marshall v. Jericho, Inc.*, 446 U.S. 238, 242, 100 S.C. 1610 (1980).

358.  This rule of impartiality derives from the common law, which has long recognized the principle that "[n]o man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." *The Federalist No. 10*, at 59 (J. Cooke ed. 1961); *see also*, e.g., Edward Coke, *1 Institutes of the Laws of England* 141 (12th ed. 1738).

359.  The Due Process Clause constitutionalizes the judicial-impartiality requirement because, the Supreme Court has explained, it is among "those settled usages and modes of proceeding" that comprise "due process of law." *Tummy v. Ohio*, 273 U.S. 510, 523, 47 S.C. 437 (1927).

360.  On or about August 18, 2020, Gonzalez, acting under color of state law and acting as a law enforcement officer employed by OCSO, deprived Plaintiff of his rights guaranteed by the United States Constitution, (as recognized in 42 U.S.C. § 1983), in that Defendant arrested Plaintiff for the offense of battery, and then participated in the commencement of the prosecution thereafter pertaining to Campbell.

361.  Gonzalez acted at the behest of Sheriff Stephen, ASA Hendricks, and ASA Albright, as more fully alleged in paragraphs 227 through 273, all under color of state law.

362.    All defendants acted under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the office of Defendant Sheriff and the Office of the State Attorney for the Nineteenth Judicial Circuit.

363.    This Count is being brought against Defendants Sheriff Stephen, Gonzalez, ASA Hendricks and ASA Albright, in their individual capacities, pursuant to U.S.C. Amendments IV & XIV, 42 U.S.C. § 1983 and § 1988.

364.    These defendants are the legal cause of the prosecution, the prosecution had a bona fide termination in Dr. Khan's favor, there was an absence of probable cause for the prosecution, and there was malice on the part of each of the Defendants.

365.    Malice is inferred by unique and common facts applicable to each Defendant.

366.    As to Defendant Sheriff Stephen, malice is implied by: 1) his personal and sexual relationship with Chandler, which he misrepresented under oath in a court proceeding, 2) his knowledge that Judge Wallace, his own acquaintance and also known "close friend" of Chandler, would sign Dr. Khan's arrest warrant, 3) his personal attempts to interfere directly with Dr. Khan's due process rights by calling him twice despite Dr. Khan being represented by counsel, and impliedly threatening him, 4) his assignment of the case to his close associate, Gonzalez, and 5) his desire to make sure Chandler was compensated by Dr. Khan, which could have been more easily accomplished once additional victims were developed.

367.    As to Gonzalez, malice is implied by: 1) his personal relationship with Sheriff Stephen, 2) his deliberate ignorance of facts that would lead a reasonable person to believe that Dr. Khan's acts with Campbell were not credible based on Campbell's various inconsistent statements and lack of details and similarities to Chandler's narrative, 3) the promotion of the false facts that additional victims existed when none existed, 4) his purposeful failure to advise DOH that he could not verify "additional victims," 5) his reliance on requests from ASA Hendricks and ASA Albright to request an arrest warrant for Dr. Khan, and 6) his direct participation with the DOH

in its investigation aimed to revoke Dr. Khan's medical license, and issue the ERO, without just cause.

368.   As to Defendants ASA Hendricks and ASA Albright, malice is implied by:

   1)    their personal relationship with Sheriff Stephen,

   2)    their ignorance of facts that would lead a reasonable person to believe that Dr. Khan's acts with Campbell did not occur as alleged,

   3)    their knowledge that at least one expert witness (Dr. Jara) hired by the DOH had already determined that Dr. Khan had committed no crime,

   4)    their willful failure to disclosure the exculpatory information they obtained from Dr. Jara,

   5)    their direct knowledge that Campbell and Chandler colluded in developing Campbell's version of events,

   6)    their participation in the promotion of the false fact that additional victims existed when none existed,

   7)    their direct participation with the DOH in its investigation aimed to revoke Dr. Khan's medical license, including reporting alleged violations of the ERO to the DOH,

   8)    their ignorance of a letter dated July 8, 2021 from Dr. Khan's counsel, that set forth the relationship between Sheriff Stephen and Chandler and evidence to support how Campbell was connected to Chandler,

   9)    their active efforts to convince the trial court that the relationship between Sheriff Stephen and Chandler was not relevant to the issue of Chandler's motive to extort money from Dr. Khan,

   10)   their direct communications with Sheriff Stephen during the investigation and prosecution about key aspects of both the investigation and prosecution,

   11)   their efforts to recruit an expert witness who would not be "doctor friendly" but who instead had a conflict of interest with the State Attorney's Office,

12) their comments to the media while the case was pending,

13) their comments and conversations with other persons not related to the case, such as Cheryl Griffin, who in turn began a media campaign, and

14) their purposeful use of inflammatory remarks during the Campbell criminal trial, thereby causing a mistrial.

369. As to Defendants ASA Hendricks and ASA Albright, they are not entitled to immunity because the nature of the acts complained of in this Count do not pertain to their preparation of the criminal charges and/or participating in the judicial proceedings, but rather this Count pertains to their acts performing functions not as advocates for the State of Florida's prosecution, which rather their distinct non-related acts which include the following: 1) their comments to the media about Dr. Khan and additional victims, 2) their providing of evidence to the media while the case was pending; 3) their discussions with third parties not affiliated with the prosecution about Dr. Khan, 4) their direct participation in the pre-filing investigation with Gonzalez, 5) their attempt to find an expert witness to bolster Campbell's version of the facts when in fact they knew that the DOH's own expert witness found no impropriety in Dr. Khan's alleged actions relating to Campbell, 6) their assistance in creating the impression that additional victims had actually accused Dr. Khan of wrongdoing, and 7) their use of inflammatory statements at trial when it was clear that they could not prove a case against Dr. Khan beyond a reasonable doubt, in order to get them an additional trial opportunity.

370. Where a person acts as a detective, "searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested," he is not entitled to prosecutorial immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).

371. All of these Defendants' acts were recklessly or deliberately indifferent to the constitutional rights of Plaintiff.

372.  42 U.S.C. § 1983 provides a remedy for violation of these rights.

373.  As a direct and proximate result of the acts and omissions of all the Defendants, Plaintiff suffered damages including past, present, and future emotional and physical distress, embarrassment, humiliation, shame, damage to his good name and reputation, the expense of defense fees and other expenses associated with the prosecution, all of which exist to this day and will continue in the future, and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

>    (1)     award compensatory damages against all Defendants named in this Count;

>    (2)     award reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

>    (3)     award such additional or alternative relief as may be just, proper and equitable;

and

>    (4)     grant a jury trial on all issues so triable.


### COUNT III

**(42 U.S.C. § 1983: Conspiracy to Maliciously Abuse Process (Fair Hearing)
as to Defendants Stephen, Chandler, Gonzalez, ASA Hendricks and ASA Albright,
individually - as to the issuance of the DOH Emergency Revocation Order)**

374.  Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, as fully set forth herein, and specifically as to this Count, paragraphs 189 through 213.

375.  On or about June 18, 2020, Chandler filed an administrative complaint with the DOH, seeking to revoke Dr. Khan's medical license, as more fully alleged in paragraphs 189 through 213.

376.  Defendant Chandler initiated the DOH proceeding by first providing false information about her status as a patient of Dr. Khan, and also providing false information about the nature of the encounter on February 25, 2020.

377.   Defendant Chandler furthered the DOH proceeding by providing false and inconsistent testimony in person at a hearing and in a deposition.

378.   Defendant Chandler furthered the issuance of the ERO by claiming that additional victims existed, and by contacting persons such as Dina Campbell and Cheryl Griffin to contact the DOH investigating agents.

379.   Defendant Chandler also attempted to have Dr. Khan further punished for an alleged violation of the ERO, which never occurred, when she contacted ASA Hendricks, who then aided in that process.

380.   Defendant Chandler enlisted the aid of Sheriff Stephen, Gonzalez, ASA Hendricks and ASA Albright to further the DOH proceedings in her favor, first by including facts about additional "victims" that were not true, and by creating a false factual basis for the issuance of the ERO.

381.   Gonzalez, acting under color of state law and acting as a law enforcement officer employed by OCSO, deprived Plaintiff of his rights guaranteed by the United States Constitution, (as recognized in 42 U.S.C. § 1983), in that Gonzalez in conjunction with the other named defendants herein, abused process by informing DOH agents about facts that would make it appear that Dr. Khan a "danger to the community," but were false facts – relating to the presence of additional victims.

382.   Sheriff Stephen allowed, directed, and assisted Gonzalez in participating in the DOH investigation, leading to the issuance of the ERO filed against Dr. Khan on July 13, 2020.

383.   Sheriff Stephen is sued individually for his malicious acts leading to the issuance of the ERO, and in his official capacity as the supervisor of Gonzalez.

384.   Sheriff Stephen denied Dr. Khan equal protection of the laws when he personally contacted him on two occasions during the investigations, when Dr. Khan was represented by counsel, as more specifically alleged herein, in order to impede his defense.

385.    Defendants ASA Hendricks and ASA Albright, acting outside the scope of the prosecutorial functions related to the two criminal prosecutions pertaining to Dr. Khan, abused process by: 1) contacting agents of DOH numerous times to assist in its investigation; 2) reporting alleged false violations of the ERO (made by Chandler) to DOH investigators after the ERO was issued; 3) speaking with the media about the allegations pertaining to the ERO; 4) actively participating in Chandler's civil cases against Dr. Khan by coordinating efforts with her lawyers in *The Bloom Firm*; 5) sharing details of the DOH prosecution with Sheriff Stephen and Gonzalez, all of which also lead to the issuance of the ERO filed against Dr. Khan on July 13, 2020, and furthered it thereafter.

386.    Where a person acts as a detective, "searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested," he is not entitled to prosecutorial immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).

387.    Defendants ASA Hendricks and ASA Albright are sued individually for their malicious acts leading to the issuance of the ERO, and SA Bakkedahl is sued in his official capacity for his supervision of Defendants ASA Hendricks and ASA Albright in their participation in the DOH investigation.

388.    All defendants acted under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of Defendant Sheriff and the Office of the State Attorney for the Nineteenth Judicial Circuit, and the laws of the State of Florida.

389.    This Count is being brought against Defendants Sheriff Stephen, Chandler, Gonzalez, ASA Hendricks and ASA Albright, in their individual capacities, pursuant to U.S.C. Amendments IV & XIV, 42 U.S.C. § 1983 and § 1988, and Defendants Sheriff Stephen and SA Bakkedahl in their official capacities.

390.    These defendants are part of the legal cause of the DOH issuing its ERO as more fully

alleged herein, the ERO proceeding had a bona fide termination in Dr. Khan's favor when it was rescinded on April 23, 2021, there was an absence of probable cause for the issuance of the ERO, and there was malice on the part of each of the Defendants.

391.   Malice is inferred by unique and common facts applicable to each Defendant.

392.   As to Defendant Sheriff Stephen, malice is implied by his personal and sexual relationship with Chandler, which he misrepresented under oath in a court proceeding, his attempts to interfere directly with Dr. Khan's due process rights by calling him twice, his assignment of the case to Gonzalez, who in turn communicated with agents of the DOH, and his desire to make sure Chandler was compensated by Dr. Khan.

393.   As to  Gonzalez, malice is implied by personal relationship with Defendant Sheriff Stephen, his deliberate ignorance of facts that would lead a reasonable person to believe that Dr. Khan's acts with Chandler were consensual and not criminal, the promotion of the notion to DOH agents that additional victims existed when none existed, and his participation with the DOH in its investigation aimed to revoke Dr. Khan's medical license, and cause the issuance of the ERO because Dr. Khan was allegedly a "danger to the community."

394.   As to Defendant Chandler, malice is implied by her clear desire to further her extortion scheme by putting pressure on Dr. Khan to settle her civil case, her material misstatements in the DOH proceedings, including but not limited to the promotion of the false information about additional "victims," her reporting of a false violation of the ERO, and her use of *the Bloom Firm* lawyers to work with the DOH.

395.   As to Defendants ASA Hendricks and ASA Albright, malice is implied by:

   1)      their personal relationship with Sheriff Stephen,

   2)      their ignorance of facts that would lead a reasonable person to believe that Dr. Khan's acts with either Chandler or Campbell did not occur as alleged,

   3)      their knowledge that at least one expert witness (Dr. Jara) hired by the DOH had already determined that Dr. Khan had committed no crime,

4)      their willful failure to disclosure the exculpatory information they obtained from Dr. Jara,

5)      their direct knowledge that Campbell and Chandler colluded in developing Campbell's version of events,

6)      their participation in the promotion of the false fact that additional victims existed when none existed,

7)      their direct participation with the DOH in its investigation aimed to revoke Dr. Khan's medical license, including reporting alleged violations of the ERO to the DOH,

8)      their ignorance of a letter dated July 8, 2021 from Dr. Khan's counsel, that set forth the relationship between Sheriff Stephen and Chandler and evidence to support how Campbell was connected to Chandler,

9)      their direct communications with Sheriff Stephen during the investigation and prosecution about key aspects of both the investigation and prosecution, and

11)     their comments to the media while the DOH proceeding was pending,

396.    As to Defendants ASA Hendricks and ASA Albright, they are not entitled to immunity because the nature of the acts complained of in this Count do not pertain to their preparing the criminal charges and/or participating in the judicial proceedings, but rather this Count pertains to their acts performing functions not as an advocate for the State of Florida, such as their comments to the media, their discussions with third parties not affiliated with the prosecution, participating in the DOH investigation by contacting various agents with the DOH, fueling the media frenzy by abusing Marsy's law as more fully alleged herein, by creating the impression that additional victims had actually accused Dr. Khan of wrongdoing, all of which contributed to the issuance of the ERO.

397.    SA Bakkedahl knew of, and approved the actions of Defendants ASA Hendricks and ASA Albright as more fully alleged herein.

398.   Sheriff Stephen knew of, and approved the actions of Gonzalez as more fully alleged herein

399.   All of these Defendants' acts were recklessly or deliberately indifferent to the constitutional rights of Plaintiff.

400.   42 U.S.C. § 1983 provides a remedy for violation of these rights.

401.   As a direct and proximate result of the acts and omissions of all the Defendants, Plaintiff suffered damages including past, present, and future emotional and physical distress, embarrassment, humiliation, shame, damage to his good name and reputation, the expense of defense fees and other expenses associated with the battery arrest and prosecution, all of which exist to this day and will continue in the future, and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

    (1)    award compensatory damages against all Defendants named in this Count;

    (2)    award reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

    (3)    award such additional or alternative relief as may be just, proper and equitable; and

    (4)    grant a jury trial on all issues so triable.


## COUNT IV

### (42 U.S.C. § 1983: Conspiracy to Maliciously Abuse Process as to Defendants - Sheriff Stephen and SA Bakkedahl, in their official capacities as to the filing and litigation of Chandler's civil lawsuit)

402.   Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, as fully set forth herein, and specifically as to this Count, paragraphs 214 through 230.

403.   42 USC § on 1983 provides a cause of action against any person who, "under color of" state law, deprives another of his or her rights, privileges, or immunities secured by the Constitution."

404. The constitutional right at issue in this case is grounded in the Fourteenth Amendment's Due Process Clause, which provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

405. Defendants Sheriff Stephen, Gonzalez, ASA Hendricks and ASA Albright together and individually made an illegal, improper, or perverted use of process relating to the civil case referenced herein, filed by Chandler against Dr. Khan and Gateway Medical, as more fully alleged in paragraphs 210 through 226.

406. Each of these defendants had an ulterior motive or purpose in exercising the illegal, improper or perverted process, in that they acted to use the criminal prosecutions referenced herein to force a payment by Dr. Khan to Chandler, as part of this civil case.

407. The civil case was ultimately dismissed by Chandler, as alleged herein, after Dr. Khan expended time, money, and resources defending it.

408. All of these Defendants' acts were recklessly or deliberately indifferent to the constitutional rights of Plaintiff.

409. 42 U.S.C. § 1983 provides a remedy for violation of these rights

410. As a direct and proximate result of the acts and omissions of all of these Defendants, Plaintiff suffered damages including past, present, and future emotional and physical distress, embarrassment, humiliation, shame, damage to his good name and reputation, the expense of defense fees and other expenses associated with the abuse of the process, all of which exist to this day and will continue in the future, and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(1)     award compensatory damages against all Defendants named in this Count;

(2)     award reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

(3)     award such additional or alternative relief as may be just, proper and equitable,

including the granting of a jury trial.

## COUNT V

### (42 U.S.C. § 1983: Conspiracy to Maliciously Prosecute as to Defendants - Sheriff Stephen and SA Bakkedahl, in their official capacities as to the Campbell criminal trial)

411.  Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, as fully set forth herein, and specifically as to this Count, paragraphs 237 through 277.

412.  42 USC § on 1983 provides a cause of action against any person who, "under color of" state law, deprives another of his or her rights, privileges, or immunities secured by the Constitution."

413.  The constitutional right at issue in this case is grounded in the Fourteenth Amendment's Due Process Clause, which provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

414.  Defendants Sheriff Stephen and SA Bakkedahl supervised their agents, including Gonzalez, ASA Hendricks and ASA Albright, whom together and individually promoted the prosecution of Dr. Khan in the Campbell case.

415.  On or about August 18, 2020, Gonzalez, acting under color of state law and acting as a law enforcement officer employed by OCSO, deprived Plaintiff of his rights in that Defendant arrested Plaintiff for the offense of battery, and then commenced and/or procured the criminal prosecution thereafter pertaining to Campbell

416.  These defendants are the legal cause of the prosecution, the prosecution had a bona fide termination in Dr. Khan's favor, there was an absence of probable cause for the prosecution, and there was malice on the part of each of the Defendants.

417.  Malice is inferred by unique and common facts applicable to each Defendant vis-a-vis

their agents Gonzalez, ASA Hendricks and ASA Albright, as more specifically referenced in paragraphs 367 through 369.

418.   Where a person acts as a detective, "searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested," he is not entitled to prosecutorial immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).

419.   All of these Defendants' acts were recklessly or deliberately indifferent to the constitutional rights of Plaintiff.

420.   42 U.S.C. § 1983 provides a remedy for violation of these rights

421.   As a direct and proximate result of the acts and omissions of all of these Defendants, Plaintiff suffered damages including past, present, and future emotional and physical distress, embarrassment, humiliation, shame, damage to his good name and reputation, the expense of defense fees and other expenses associated with the abuse of the process, all of which exist to this day and will continue in the future, and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(1)   award compensatory damages against all Defendants named in this Count;

(2)   award reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

(3)   award such additional or alternative relief as may be just, proper and equitable, including the granting of a jury trial.

## COUNT VI

**(Malicious Abuse of Process as to Defendants Sheriff Stephen, Gonzalez, Chandler ASA Hendricks and ASA Albright, in their individual capacities - as to the proceedings involving the issuance of the DOH Emergency Revocation Order)**

422.   Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, and more specifically paragraphs 214 through 230, as more fully set

forth herein**.**

423.    Defendants Sheriff Stephen, Gonzalez, Chandler, ASA Hendricks and ASA Albright together and individually made an illegal, improper, or perverted use of process relating to the issuance of the ERO by the Florida Department of Health, as more specifically alleged in paragraphs 142 through 178.

424.    Each of these defendants had an ulterior motive or purpose in exercising the illegal, improper or perverted process, in that they acted to use the criminal prosecutions referenced herein to promote the issuance of the ERO.

425.    The ERO was ultimately dismissed by DOH, as alleged herein, after Dr. Khan expended time, money, and resources defending against it.

426.    Where a person acts as a detective, "searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested," he is not entitled to prosecutorial immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).

427.    As a direct and proximate result of the acts and omissions of all of these Defendants, Plaintiff suffered damages including past, present, and future emotional and physical distress, embarrassment, humiliation, shame, damage to his good name and reputation, the expense of defense fees and other expenses associated with the abuse of the process, all of which exist to this day and will continue in the future, and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(1)    award compensatory damages against all Defendants named in this Count; and

(2)    award such additional or alternative relief as may be just, proper and equitable, including the granting of a jury trial.

## COUNT VII

### (Malicious Abuse of Process as to Defendants Sheriff Stephen, Gonzalez, ASA Hendricks and ASA Albright - as to the Chandler civil case filed against Dr. Khan)

428.   Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, as fully set forth herein**,**  and specifically as to this Count, paragraphs 214 through 230**.**

429.   Defendants Sheriff Stephen, Gonzalez, ASA Hendricks and ASA Albright together and individually made an illegal, improper, or perverted use of process relating to the civil case referenced herein, filed by Chandler against Dr. Khan and Gateway Medical, as more fully alleged in paragraphs 210 through 226.

430.   Each of these defendants had an ulterior motive or purpose in exercising the illegal, improper or perverted process, in that they acted to use the criminal prosecutions referenced herein to force a payment by Dr. Khan to Chandler.

431.   Where a person acts as a detective, as in the conduct of ASA Hendricks and ASA Albright, "searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested," he is not entitled to prosecutorial immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).

432.   The Chandler civil case was ultimately dismissed by Chandler, as alleged herein, but only after Dr. Khan expended time, money, and resources defending against it.

433.   As a direct and proximate result of the acts and omissions of all of these Defendants, Plaintiff suffered damages including past, present, and future emotional and physical distress, embarrassment, humiliation, shame, damage to his good name and reputation, the expense of defense fees and other expenses associated with the abuse of the process, all of which exist to this day and will continue in the future, and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

    (1)    award compensatory damages against all Defendants named in this Count; and

    (2)    award such additional or alternative relief as may be just, proper and equitable, including the granting of a jury trial.

**COUNT VIII**

**(Malicious Prosecution as to Defendants Sheriff Stephen
and Gonzalez, in their individual capacities
- the Chandler Criminal Prosecution)**

434.    Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, as fully set forth herein**,** and specifically as to this Count, paragraphs 88 through 144.

435.    On or about June 19, 2020, Gonzalez, acting under color of state law and acting as a law enforcement officer employed by OCSO, deprived Plaintiff of his rights guaranteed by the United States Constitution, (as recognized in 42 U.S.C. § 1983), in that Defendant arrested Plaintiff for the offense of battery, which then commenced a prosecution thereafter pertaining to Chandler.

436.    These defendants are the legal cause of the prosecution, the prosecution had a bona fide termination in Dr. Khan's favor, there was an absence of probable cause for the prosecution, and there was malice on the part of each of the Defendants.

437.    As to Defendant Chandler, malice is implied by: 1) her personal relationship with Sheriff Stephen, 2) her material misstatements to law enforcement about whether she was a patient of Dr. Khan, and whether the acts were consensual, 3) her active promotion of the notion that additional victims existed when none existed, 4) her use of ASA Hendricks and ASA Albright to further her vengeance on Dr. Khan, 5) her direct participation with the DOH in its investigation aimed to revoke Dr. Khan's medical license, and issue the ERO, and 6) her collusion with Trent and Campbell and Griffin to put further pressure on Dr. Khan publicly.

**Page 79 of 95**

438.    As to Gonzalez, malice is implied by: 1) his personal relationship with  Sheriff Stephen, 2) his deliberate ignorance of facts that would lead a reasonable person to believe that Dr. Khan's acts with Chandler were consensual and not criminal based on the controlled Facetime call referenced herein, 3) his instructions to Chandler during the controlled calls to act flirtatious; 4) his direct participation in creating false facts that additional victims existed when none existed, 5) his failure to advise DOH that he could not verify "additional victims," 6) his reliance on requests from ASA Hendricks and ASA Albright to request an arrest warrant for Dr. Khan, 7) and his direct participation with the DOH in its investigation aimed to revoke Dr. Khan's medical license, and issue the ERO.

439.    As a direct and proximate result of the acts and omissions of all the Defendants, Plaintiff suffered damages including past, present, and future emotional and physical distress, embarrassment, humiliation, shame, damage to his good name and reputation, the expense of defense fees and other expenses associated with the prosecution, all of which exist to this day and will continue in the future, and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(1)    award compensatory damages against all Defendants named in this Count;

(2)    award such additional or alternative relief as may be just, proper and equitable; and

(3)    grant a jury trial on all issues so triable.

## COUNT IX

### (Malicious Prosecution as to Defendants Stephen, Gonzalez, ASA Hendricks and ASA Albright, in their individual capacities - the CAMPBELL Criminal Prosecution)

440.    Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, as fully set forth herein, and specifically as to this Count, paragraphs 231

through 277.

441. On or about August 18, 2020, Gonzalez, acting under color of state law and acting as a law enforcement officer employed by OCSO, deprived Plaintiff of his rights guaranteed by the United States Constitution, (as recognized in 42 U.S.C. § 1983), in that Defendant arrested Plaintiff for the offense of battery, which then commenced a prosecution thereafter pertaining to Campbell.

442. These defendants are the legal cause of the prosecution, the prosecution had a bona fide termination in Dr. Khan's favor, there was an absence of probable cause for the prosecution, and there was malice on the part of each of the Defendants.

443. As to Defendant Sheriff Stephen, malice is implied by: 1) his personal and sexual relationship with Chandler, which he misrepresented under oath in a court proceeding, 2) his knowledge that Judge Wallace, his own acquaintance and also known "close friend" of Chandler, would sign Dr. Khan's arrest warrant, 3) his personal attempts to interfere directly with Dr. Khan's due process rights by calling him twice despite Dr. Khan being represented by counsel, and impliedly threatening him, 4) his assignment of the case to his close associate, Gonzalez, and 5) his desire to make sure Chandler was compensated by Dr. Khan, which could have been more easily accomplished once additional victims were developed.

444. As to Gonzalez, malice is implied by: 1)  his personal relationship with  Sheriff Stephen, 2) his deliberate ignorance of facts that would lead a reasonable person to believe that Dr. Khan's acts with Campbell were not credible based on Campbell's various inconsistent statements and lack of details and similarities to Chandler's narrative, 3) the promotion of the false facts that additional victims existed when none existed, 4) his failure to advise DOH that he could not verify "additional victims," 5) his reliance on requests from ASA Hendricks and ASA Albright to request an arrest warrant for Dr. Khan, and 6) his direct participation with the DOH in its investigation aimed to revoke Dr. Khan's medical license, and issue the ERO, without just cause.

445.   As to Defendants ASA Hendricks and ASA Albright, malice is implied by:

1)   their personal relationship with Sheriff Stephen,

2)   their ignorance of facts that would lead a reasonable person to believe that Dr. Khan's acts with Campbell did not occur as alleged,

3)   their knowledge that at least one expert witness (Dr. Jara) hired by the DOH had already determined that Dr. Khan had committed no crime,

4)   their willful failure to disclosure the exculpatory information they obtained from Dr. Jara,

5)   their direct knowledge that Campbell and Chandler colluded in developing Campbell's version of events,

6)   their participation in the promotion of the false fact that additional victims existed when none existed,

7)   their direct participation with the DOH in its investigation aimed to revoke Dr. Khan's medical license, including reporting alleged violations of the ERO to the DOH,

8)   their ignorance of a letter dated July 8, 2021 from Dr. Khan's counsel, that set forth the relationship between Sheriff Stephen and Chandler and evidence to support how Campbell was connected to Chandler,

9)   their active efforts to convince the trial court that the relationship between Sheriff Stephen and Chandler was not relevant to the issue of Chandler's motive to extort money from Dr. Khan,

10)   their direct communications with Sheriff Stephen during the investigation and prosecution about key aspects of both the investigation and prosecution,

11)   their efforts to recruit an expert witness who would not be "doctor friendly" but who instead had a conflict of interest with the State Attorney's Office,

12)   their comments to the media while the case was pending,

13)   their comments and conversations with other persons not related to the case,

such as Cheryl Griffin, who in turn began a media campaign, and

14)     their purposeful use of inflammatory remarks during the Campbell criminal trial, thereby causing a mistrial.

446.    Where a person acts as a detective, as in the conduct of ASA Hendricks and ASA Albright, "searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested," he is not entitled to prosecutorial immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).

447.    As a direct and proximate result of the acts and omissions of all the Defendants, Plaintiff suffered damages including past, present, and future emotional and physical distress, embarrassment, humiliation, shame, damage to his good name and reputation, the expense of defense fees and other expenses associated with the prosecution, all of which exist to this day and will continue in the future, and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(1)     award compensatory damages against all Defendants named in this Count;

(2)     award such additional or alternative relief as may be just, proper and equitable; and

(3)     grant a jury trial on all issues so triable.

## COUNT X
### (Section 1983 False Arrest as to
### Defendant Gonzalez individually - Chandler case)

448.    Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, as fully set forth herein,  and specifically referenced in paragraphs 121 through 144.

449.    42 USC § on 1983 provides a cause of action against any person who, "under color

of" state law, deprives another of his or her rights, privileges, or immunities secured by the Constitution."

450.   The constitutional right at issue in this case is grounded in the Fourteenth Amendment's Due Process Clause, which provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

451.   On or about June 19, 2020, Gonzalez, acting under color of state law and acting as a law enforcement officer employed by Defendant Sheriff Stephen, deprived Plaintiff of his rights guaranteed by the United States Constitution, (as recognized in 42 U.S.C. § 1983), in that   Gonzalez detained and arrested Plaintiff for the offense of misdemeanor battery, which then commenced a prosecution thereafter.

452.   Gonzalez, acting in the course and scope of his duties as full-time police officer, intentionally detained and otherwise arrested Plaintiff, thereby depriving Plaintiff of his  freedom and liberty by restraining him in his movements.  That detention and arrest was without the consent of Plaintiff, against his will, unlawful, and not based upon a valid warrant or other judicial process.

453.   Gonzalez acted with reckless disregard for the rights of Plaintiff in arresting Plaintiff without probable cause, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

454.   The lack of probable cause was based, in part, on the Defendants knowledge established before the arrest that the physical encounter between Dr. Khan and Chandler was consensual, and therefore, not a battery. Furthermore, Gonzalez knew that Chandler  had orchestrated the extortion scheme, and as part of that scheme, Dr. Khan was to be arrested.

455.   But for that illegitimate criminal charge lodged by Gonzalez, Plaintiff would not have faced detention.

456.   Gonzalez knew that the arrest of Plaintiff was constitutionally infirm because of the

lack of probable cause.

457.   42 U.S.C. § 1983 provides a remedy for violation of these rights.

458.   As a result of this constitutional violation, Plaintiff suffered damages including past, present, and future emotional distress, embarrassment, record sealing, removal of negative information from the Internet, humiliation, shame, criminal defense attorneys' fees and expenses, loss of property, and sealing fees, all of which exist to this day and will continue in the future, and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(1)   award compensatory damages against all Defendants named in this Count;

(2)   award reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

(3)   award such additional or alternative relief as may be just, proper and equitable, including the granting of a jury trial.

**COUNT XI**
**(Section 1983 False Arrest as to**
**Defendant Gonzalez individually - Campbell case)**

459.   Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, as fully set forth herein, and specifically referenced in paragraphs 231 through 277.

460.   On or about August 18, 2020, Gonzalez, acting under color of state law and acting as a law enforcement officer employed by Defendant Sheriff Stephen, deprived Plaintiff of his rights guaranteed by the United States Constitution, (as recognized in 42 U.S.C. § 1983), in that Gonzalez detained and arrested Plaintiff for the offense of misdemeanor battery, which then commenced a prosecution thereafter.

461.   42 USC § on 1983 provides a cause of action against any person who, "under color of" state law, deprives another of his or her rights, privileges, or immunities secured by the Constitution."

462.   The constitutional right at issue in this case is grounded in the Fourteenth Amendment's Due Process Clause, which provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

463.   Gonzalez, acting in the course and scope of his duties as full-time police officer, intentionally detained and otherwise arrested Plaintiff, thereby depriving Plaintiff of his freedom and liberty by restraining him in his movements. That detention and arrest was without the consent of Plaintiff, against his will, unlawful, and not based upon a valid warrant or other judicial process.

464.   Gonzalez acted with reckless disregard for the rights of Plaintiff in arresting Plaintiff without probable cause, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

465.   The lack of probable cause was based, in part, on the Defendants knowledge established before the arrest that the physical encounter between Dr. Khan and Campbell was not a battery, but the allegation was an attempt to extort Dr. Khan and to assist Defendant Chandler, because Gonzalez knew of the relationship between Chandler and Campbell and knew that they had worked together to orchestrate the extortion scheme, and as part of that scheme, Dr. Khan was to be arrested.

466.   But for that illegitimate criminal charge lodged by Gonzalez, Plaintiff would not have faced detention.

467.   Gonzalez knew that the arrest of Plaintiff was constitutionally infirm because of the lack of probable cause.

468.   42 U.S.C. § 1983 provides a remedy for violation of these rights.

469.   As a result of this constitutional violation, Plaintiff suffered damages including past, present, and future emotional distress, embarrassment, record sealing, removal of negative information from the Internet, humiliation, shame, criminal defense attorneys' fees and expenses, loss of property, and sealing fees, all of which exist to

this day and will continue in the future, and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

    (1)    award compensatory damages against all Defendants named in this Count;

    (2)    award reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

    (3)    award such additional or alternative relief as may be just, proper and equitable, including the granting of a jury trial.

## COUNT XII

### (Section 1983 False Arrest as to Defendant Sheriff Stephen in his official capacity - Chandler and Campbell criminal cases)

470.    Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, as fully set forth herein, and specifically referenced in paragraphs 88 through 144, and 231 through 277.

471.    On or about June 19, 2020, Gonzalez, acting under color of state law and acting as a law enforcement officer employed by Defendant Stephen, deprived Plaintiff of his rights guaranteed by the United States Constitution, (as recognized in 42 U.S.C. § 1983), in that Gonzalez detained and arrested Plaintiff for the offense of misdemeanor battery, which then commenced a prosecution thereafter.

472.    Again, on or about August 18, 2020, Gonzalez, acting under color of state law and acting as a law enforcement officer employed by Defendant Sheriff Stephen, deprived Plaintiff of his rights guaranteed by the United States Constitution, (as recognized in 42 U.S.C. § 1983), in that Gonzalez detained and arrested Plaintiff for the offense of misdemeanor battery, which then commenced a prosecution thereafter.

473.    Gonzalez, acting in the course and scope of his duties as full-time police officer, intentionally detained and otherwise arrested Plaintiff, thereby depriving Plaintiff of his freedom and liberty by restraining him in his movements. That detention and

arrest was without the consent of Plaintiff, against his will, unlawful, and not based upon a valid warrant or other judicial process.

474.   Gonzalez acted with reckless disregard for the rights of Plaintiff in arresting Plaintiff without probable cause, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

475.   Gonzalez acted at the behest of Sheriff Stephen, under his orders, customs, policies, and practices, which include the practice to provide special favors to citizens such as Chandler, in violation of state law.

476.   At all material times, Sheriff Stephen knew that there was a lack of probable cause for the arrest of Dr. Khan for either the Chandler or Campbell arrests.

477.   42 USC § on 1983 provides a cause of action against any person who, "under color of" state law, deprives another of his or her rights, privileges, or immunities secured by the Constitution."

478.   The constitutional right at issue in this case is grounded in the Fourteenth Amendment's Due Process Clause, which provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

479.   The lack of probable cause as the arrest related to Chandler was based, in part, on the Defendant Stephen's knowledge established before the arrest that the physical encounter between Dr. Khan and Chandler was consensual, and therefore, not a battery.

480.   The lack of probable cause was based, in part, on the Defendants knowledge established before the arrest related to Campbell was based in part on Defendant Stephen's knowledge that the physical encounter between Dr. Khan and Campbell was not a battery, but the allegation was an attempt to extort Dr. Khan and assist his personal friend Chandler, in the extortion scheme.

481.   But for that illegitimate criminal charges lodged by Gonzalez, acting at the behest of

Defendant Stephen, Plaintiff would not have faced detention.

482.   Defendants Gonzalez and Sheriff Stephen both knew that the two arrests of Plaintiff were constitutionally infirm because of the lack of probable cause.

483.   42 U.S.C. § 1983 provides a remedy for violation of these rights.

484.   As a result of this constitutional violation, Plaintiff suffered damages including past, present, and future emotional distress, embarrassment, record sealing, removal of negative information from the Internet, humiliation, shame, criminal defense attorneys' fees and expenses, loss of property, and sealing fees, all of which exist to this day and will continue in the future**,** and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(1)   award compensatory damages against all Defendants named in this Count;

(2)   award reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

(3)   award such additional or alternative relief as may be just, proper and equitable, including the granting of a jury trial.


## COUNT XIII

### (Reckless/Intentional Infliction of Emotional Distress as to Defendants Sheriff Stephen, Chandler, and Gonzalez, each in their individual capacities)

485.   Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, as fully set forth herein**.**

486.   Defendants, acting in concert, were intentional and/or reckless in promoting the arrest of Dr. Khan, his subsequent prosecutions, and the issuance of the ERO, and in participating in the smear campaign as more fully alleged herein.

487.   Given the relationships between the Defendants and the nature of their actions, their conduct was outrageous.

488.  The Defendants' conduct caused emotional distress to Dr. Khan such that he was fearful of losing his business, and he experienced several health problems. Dr. Khan began having what he thought were anxiety and panic episodes.  These would randomly occur when the phone rang or when he observed unknown people at his practice or in his neighborhood. The emotional distress was severe.

489.  As Dr. Khan was a long standing diabetic on an insulin pump, it became extremely difficult to manage his anxiety and stress eating – which lead to episodes of high and low blood sugars and numerous events during this time period.

490.  During Dr. Khan's deposition with the DOH on October 17, 2020, he was continually having symptomatic Ventricular Tachycardia. In a 4 minute span, he had around 11 episodes where his defibrillator went into atypical pacing mode and actually fired 7 times shocking him each time.  As a result, he was hospitalized and underwent cardiac catetherization and other testing. He was  placed on several new medications and was discharged. Rather than ask for a continuance of the DOH hearing he insisted on completing the deposition on October 21, 2020.

491.  Dr. Khan's counselors were so worried about him having a catastrophic event that they insisted his wife and him sign a waiver and have a paramedic on standby on site when Dr. Khan's deposition for the DOH proceedings was resumed.

492.  Prior to February 25, 2020, Dr. Khan had only two (2) episodes of Ventricular Tachycardia since a defibrillator had been inserted to prevent sudden death in December 2004. Starting in September 2021, Dr. Khan developed  worsening episodes of Ventricular Tachycardia causing atypical pacing and AICD firings.

493.  The arrythmias caused the left heart ventricle, which acts as the pump, to not adequately fill,  putting Dr. Khan in severe heart failure manifested by shortness of breath, low tolerance to exertion, and other symptoms, which persist to this day.

494.  On the advice of his physicians, Dr. Khan underwent a specialized procedure called ventricular ablation of several sites by Dr. Bill Stevens at Vanderbilt University in

November 2021.  One of the lesions was rate dependent which explained the AICD episodes related to the DOH deposition, and episodes of ATP/AICD firings since September 2020.

495.    Defendants' conduct caused this aforementioned severe emotional distress, which also caused Dr. Khan to be fearful of losing his business.

496.    As a direct and proximate result of the acts and omissions of all the Defendants, Plaintiff suffered damages including past, present, and future emotional and physical distress, embarrassment, humiliation, shame, damage to his good name and reputation, all of which exist to this day and will continue in the future, and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(1)    award compensatory damages against all Defendants named in this Count;

(2)    award such additional or alternative relief as may be just, proper and equitable; and

(3)    grant a jury trial on all issues so triable.

## COUNT XIV

### (Tortious Interference with Business Relationships as to Defendants Sheriff Stephen, Gonzalez, and Chandler in their individual capacities)

497.    Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, as fully set forth herein.

498.    Dr. Khan had a business relationship with various hospitals including Raulerson Hospital, in that he provided medical services to such hospitals.

499.    Dr. Khan had a business relationship with  Florida State University ("FSU") School of Medicine as an appointed faculty physician, in that he provided teaching services to FSU.

500.  Dr. Khan, through his practice, also contracted with various health insurance companies to provide reimbursements for medical treatment for his patients, which formed a business relationship between Dr. Khan and these various insurance providers.

501.  Each of the Defendants named herein knew of these business relationships in that they were known to the public, and each Defendant had personal knowledge of the relationships.

502.  Each Defendant intentionally and unjustifiedly interfered with the relationship by: 1) promoting the issuance of an ERO, as more fully alleged herein; 2) participating in a conspiracy to abuse process, as alleged in Count VI herein, and 3) furthering baseless criminal prosecutions, all of which operated to interfere with the above-referenced business relationships.

503.  As a result of the issuance of the ERO, Dr. Khan lost his hospital privileges, lost his teaching privileges at FSU, and lost insurance contracts relating to his medical practice.

504.  Dr. Khan was damaged as a result of the breach of the relationship caused by the Defendants actions.

505.  As a direct and proximate result of the acts and omissions of all the Defendants, Plaintiff suffered damages including past, present, and future emotional and physical distress, embarrassment, humiliation, shame, damage to his good name and reputation, the expense of defense fees and other expenses associated with the prosecution, all of which exist to this day and will continue in the future, and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(1)    award compensatory damages against all Defendants named in this Count;

(2)    award such additional or alternative relief as may be just, proper and equitable; and

(3)    grant a jury trial on all issues so triable.

## COUNT XV
### (Defamation as to Defendant Chandler)

506.    Plaintiff realleges and adopts by reference the allegations contained in paragraphs 1 through 335, as fully set forth herein, and specifically paragraphs 293 through 308.

507.    On or about June 23, 2020, at a various times thereafter, Defendant Chandler along with Cheryl Griffin and Monique Trent published internet posts wherein containing the following statements:

a.    "Saeed Khan is a predator!" [a/k/a sexual predator.]

b.    "There's many more victims and they need to go to the police."

c.    "PLEASE IF YOURE A VICTIM REACH OUT, CRIMINALLY."

d.    "He's been doing this for 20 + years."

e.    "He is a menace to society."

f.    "#SupportVictims."

g.    "DeportSaeedKhan." (Collectively "statements").

508.    These statements are defamatory-i.e., libel and libel per se.[6]

509.    Defendant Chandler  knew these statements were false when published.

510.    Defendant Chandler's defamation campaign against Dr. Khan was intended to force him to pay a significant amount of money for the civil matter filed by her attorneys in *The Bloom Firm* and cause injury to Dr. Khan.

511.    Defendant Chandler published these statements on the internet, they are false, defendant acted with knowledge or reckless disregard as to the falsity on a matter

---

[6]    *See Blake v. Giustibelli*, 182 So.3d 881, 884 (Fla. 4th DCA 2016)(a publication is libelous per se, or actionable per se, if it charges that a person has committed an infamous crime, it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace or it tends to injure one in his trade or profession).

concerning a private person such as Dr. Khan.

512.    As a direct and proximate result of the acts and omissions of Defendant Chandler, Plaintiff suffered damages including past, present, and future emotional and physical distress, embarrassment, humiliation, shame, damage to his good name and reputation, the expense of defense fees and other expenses associated with the prosecution, all of which exist to this day and will continue in the future, and which are more specifically alleged in paragraph 335 and its sub-parts.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(1)    award compensatory damages against Defendant Chandler;

(2)    award such additional or alternative relief as may be just, proper and equitable;

and    (3)    grant a jury trial on all issues so triable.

Respectfully submitted this 25th day of April, 2023.

*Valentin Rodriguez*

_____
VALENTIN RODRIGUEZ, ESQ.
Valentin Rodriguez, P.A.
2465 Mercer Avenue, Suite 301
West Palm Beach, Florida 33401
Florida Bar No. 047661
(561) 832-7510
(Fax 561-701-9296)
*defend@bellsouth.net*

**Counsel for Plaintiff Dr. Khan**

# <u>LIST OF EXHIBITS</u>

**Exhibit 1**   **(Composite exhibit of selected text messages between Chandler and Sheriff Stephen)**

**Exhibit 2**   **(Composite exhibit of text messages between Wallace and Chandler)**

**Exhibit 3**   **(Arrest Warrant)**

**Exhibit 4**   **(Composite exhibit of text messages between Chandler and Deloreto)**